# Illinois Official Reports

## Appellate Court

---

### *People v. Richardson*, 2015 IL App (1st) 113075

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE RICHARDSON, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-3075 |
| Filed<br>Rehearing denied | March 25, 2015<br>April 20, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 01-CR-6428; the Hon. Diane Gordon Cannon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and S. Amanda Ingram, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon Waters, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justice Neville concurred in the judgment and opinion.<br>Justice Pucinski dissented, with opinion. |

**OPINION**

¶ 1    Defendant Andre Richardson appeals from the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2010)). On appeal, Richardson contends that his petition sufficiently alleged an ineffective assistance of counsel claim based on trial counsel's failure to acquire and produce evidence of his mental impairment to demonstrate his inability to waive his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). We affirm.

¶ 2                                  BACKGROUND

¶ 3    On February 9, 2001, Richardson, who was 16 years old, was arrested at 4837 South St. Lawrence Avenue in Chicago in connection with the murder of his 11-month-old daughter, Diamond Clark. At the police station, Richardson gave a videotaped statement in which he made inculpatory remarks, including that he bit his daughter, struck her numerous times with a coat hanger and belt, struck her face with his hands, struck her in the ribs, and shook her.

¶ 4    Prior to trial, the defense filed a motion to suppress Richardson's videotaped statement as involuntary. In the motion, Richardson alleged, in part, that he was incapable of understanding the full meaning of his *Miranda* rights and that the statements sought to be suppressed were obtained as a result of physical coercion illegally directed against him by police. After a hearing, at which the evidence showed that Richardson received an injury to his left eye at the police station lockup, the trial court denied the motion to suppress. The court found that although Richardson was injured at the police station, the detectives and assistant State's Attorney who questioned him were not involved in the altercation. Furthermore, Richardson was advised of his rights, did not complain of any pain or request medical assistance, and appeared calm in the videotape. The trial court thus concluded that the totality of the circumstances showed that the confession was voluntary.

¶ 5    At Richardson's 2005 jury trial, the trial court admitted into evidence his videotaped inculpatory statement and forensic evidence. The State's evidence at trial also included the testimony of Cyntoria Clark, the baby's mother; James Franklin, an eyewitness to part of the beating; Monica Smith, the neighbor who called "911"; Michael Hayes, the arresting officer; and Assistant State's Attorney (ASA) John Heil. Richardson, the sole witness for the defense, testified that his videotaped statement was true, except for hitting his daughter with a belt, which he did not do. At the close of the evidence, the jury returned a verdict of guilty of first degree murder.

¶ 6    At sentencing, the presentence investigation report (PSI) revealed that Richardson had been a learning-disabled student throughout his life and that, when he was transferred to jail at age 17, he could not read. The fitness evaluation presented at sentencing concluded that Richardson was fit for sentencing. It also indicated that he achieved a full-scale IQ score of 61, which falls within the extremely low range of intellectual functioning and ranked him at the 0.5 percentile when compared to his same-aged peers. The evaluation also stated that Richardson "appears to fall in the upper echelon of mild mental retardation." Following a sentencing hearing, the court sentenced Richardson to 40 years' imprisonment.

¶ 7    On appeal, this court reversed Richardson's conviction on the basis that the trial court erred in denying his motion to suppress where the State failed to prove by clear and convincing

evidence that his eye injury was not inflicted in order to obtain a confession. *People v. Richardson*, 376 Ill. App. 3d 537 (2007). The State was granted leave to appeal to the Illinois Supreme Court. *People v. Richardson*, 226 Ill. 2d 627 (2008). Before our supreme court, the State argued that Richardson's inculpatory statement was voluntary and not coerced. The supreme court agreed and reversed this court's decision, instructing this court to consider Richardson's remaining contentions. *People v. Richardson*, 234 Ill. 2d 233 (2009).

¶ 8 On remand, this court considered Richardson's remaining contentions, and affirmed the judgment of the trial court. *People v. Richardson*, 401 Ill. App. 3d 45 (2010). In relevant part, this court rejected Richardson's claim that he was denied effective assistance of trial counsel based on counsel's failure to offer expert testimony concerning his mental impairment during the motion to suppress hearing. *Id*. at 46. We acknowledged that Richardson's mental capacity was raised during sentencing but observed that the information in the PSI did not deal with Richardson's ability to waive his *Miranda* rights. *Id*. at 48.

¶ 9 On June 15, 2011, Richardson filed a *pro se* postconviction petition alleging that his trial counsel was ineffective for failing to present evidence of his limited mental capacity at the hearing on his motion to suppress statements. Richardson asserted that this evidence would have shown that he could not have knowingly and intelligently waived his *Miranda* rights prior to providing his inculpatory statements to the State. Richardson specifically alleged in his petition:

> "Trial counsel's failure to marshall [*sic*] evidence on [defendant's] diminished mental capacity at the motion to suppress, and her failure to argue such evidence coupled with [defendant's] youth weighed in favor of suppression, was objectively unreasonable because such evidence was highly relevant in determining the validity of the *Miranda* waiver and the voluntariness of [defendant's] statement."

Richardson did not sign his petition or attach a verification affidavit. However, he did attach transcripts from three pretrial court dates in which defense counsel represented to the court that she had hired an expert to examine Richardson regarding his ability to waive his *Miranda* rights and that she was in the process of having the examination conducted. Richardson also attached to his petition transcripts showing that he was unable to spell "Cyntoria," the name of his baby's mother. Richardson's allegation is premised on the information included in the PSI.

¶ 10 On September 13, 2011, the circuit court issued a written order dismissing the petition as frivolous and patently without merit. In doing so, the circuit court held that it would follow this court's 2010 decision on appeal, which determined that Richardson could not establish that he was provided ineffective assistance of counsel, declined to assume that the result of the evaluation was favorable and not used or that counsel failed to conduct an evaluation, and found that Richardson was fit for sentencing. Richardson now appeals the propriety of that dismissal.

¶ 11                                                    ANALYSIS

¶ 12 We initially reject the State's contention that Richardson's petition was properly dismissed at the first stage of proceedings solely on the basis that his petition lacked both a verification affidavit and his signature on the petition.

¶ 13 A postconviction proceeding "shall be commenced by filing with the clerk of the court in which the conviction took place a petition (together with a copy thereof) verified by affidavit."

725 ILCS 5/122-1(b) (West 2010). After the briefs were filed in this case, our supreme court explained that, "at the first stage of proceedings, the court considers the petition's substantive virtue rather than its procedural compliance." *People v. Hommerson*, 2014 IL 115638, ¶ 11. Specifically, with respect to a lack of an affidavit, our supreme court held that "the circuit court may not dismiss a petition at the first stage proceedings solely on the basis that it lacked a verification affidavit," and "[t]hat deficiency is properly the subject of a motion to dismiss at the second stage of proceedings." *Id*. ¶¶ 11, 14. In following our supreme court's reasoning in *Hommerson*, we find that the lack of a verification affidavit and signature affixed to Richardson's petition is not dispositive at the first stage of proceedings. In so finding, we now turn to Richardson's substantive argument that he was denied effective assistance of counsel.

¶ 14      On appeal, Richardson contends that he raised an arguable claim of ineffective assistance of counsel. He specifically maintains that his counsel was ineffective for failing to have him evaluated for his ability to understand *Miranda* where there was reason to believe he was mentally retarded. If he was of such limited functioning that he could not understand *Miranda*, then he asserts it was at least arguable that the court would have suppressed his confession following the hearing on his motion.

¶ 15      The Act provides a method by which persons under criminal sentences can assert that their convictions resulted from a substantial denial of their constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2010). At the first stage of postconviction proceedings, the trial court must independently review the petition, taking the allegations as true and determine whether the petition is "frivolous or patently without merit." *People v. Hodges*, 234 Ill. 2d 1, 10 (2009); 725 ILCS 5/122-2.1(a)(2) (West 2010). A petition may be summarily dismissed as frivolous or patently without merit only if the person has no arguable basis in either law or in fact. *People v. Tate*, 2012 IL 112214, ¶ 9. "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Hodges*, 234 Ill. 2d at 16.

¶ 16      The first stage in the proceedings allows the trial court "to act strictly in an administrative capacity by screening out those petitions which are without legal substance or are obviously without merit." *People v. Rivera*, 198 Ill. 2d 364, 373 (2001). Because most first-stage postconviction petitions are drafted by defendants with little legal knowledge, the "threshold for survival [is] low." *Tate*, 2012 IL 112214, ¶ 9. We review the summary dismissal of a postconviction petition *de novo*. *Id*. ¶ 10.

¶ 17      A defendant alleging ineffective assistance of counsel at the first stage of proceedings must show it is arguable that counsel's performance fell below an objective standard of reasonableness and arguable that defendant was prejudiced. *Tate*, 2012 IL 112214, ¶ 19 (citing *Hodges*, 234 Ill. 2d at 17). In the instant case, Richardson has not presented an arguable claim of prejudice. See *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 70 (if a claim of ineffectiveness may be disposed of due to lack of prejudice, a reviewing court is not required to address whether counsel's performance was unreasonable). To establish the prejudice prong of an ineffective assistance of counsel claim in the context of a motion to suppress, the defendant must demonstrate that the "unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15; *People v. Lundy*, 334 Ill. App. 3d 819, 830 (2002).

¶ 18    Here, Richardson failed to make an arguable claim that his motion to suppress would have succeeded had trial counsel presented evidence of his mental deficiency at the hearing. The inquiry as to whether a defendant knowingly and voluntarily waived his *Miranda* rights focuses on the totality of the circumstances surrounding the interrogation. *People v. Smith*, 178 Ill. App. 3d 976, 982 (1989). While mental deficiency is one factor to be considered when deciding whether *Miranda* rights were validly waived, evidence of a limited intellect, alone, is not proof that one was incapable of waiving constitutional rights. *Id*.; see also *People v. Henderson*, 175 Ill. App. 3d 483, 486, 489 (1988); *People v. Burke*, 164 Ill. App. 3d 889, 894-99 (1987); *People v. Creamer*, 143 Ill. App. 3d 64, 68, 70-71 (1986); *People v. Clements*, 135 Ill. App. 3d 1001, 1005, 1107-08 (1985); *People v. Racanelli*, 132 Ill. App. 3d 124, 132-33 (1985) (the defendants, who possessed IQ scores similar to that of defendant in this case, were found to have knowingly and intelligently waived their rights). Other facts to consider include defendant's age, prior experience with the criminal law, and emotional stability. *Smith*, 178 Ill. App. 3d at 982. Both the characteristics of the accused and details of the interrogation must be considered (*id*.), including the manner in which a defendant answers questions (*People v. Williams*, 128 Ill. App. 3d 384, 392 (1984)).

¶ 19    A review of the record here shows that even if trial counsel had introduced evidence of Richardson's limited mental capabilities at the hearing on the motion to suppress, the trial court would still have denied his motion because, based on the totality of the circumstances, it is clear that Richardson knowingly and intelligently waived his *Miranda* rights. Richardson's presentencing psychological evaluation indicated that he was in the "upper echelon of mild mental retardation," but that despite his cognitive impairment, at the time of evaluation, the problem was not so severe as to compromise his ability to understand the nature and purpose of the proceedings pending against him. The evaluation noted that Richardson conveyed a clear awareness of the status of his case, an adequate understanding of courtroom procedure, the role and responsibilities of key courtroom personnel, and dispositions that he faced. The record also shows that he had a criminal history in that he had been previously arrested and adjudicated a delinquent minor for aggravated battery.

¶ 20    Furthermore, Richardson was 16 years old when he waived his *Miranda* rights in this case, and the videotaped statement showed him being advised of and waiving his *Miranda* rights before providing the details of what he did to his infant daughter. In waiving his rights, ASA Heil asked Richardson if he knew what each right meant and then asked him to explain what the right meant to him, which he did. Where extensive testimony reveals that a defendant understood his *Miranda* rights and gave responsive answers to questions, a court may properly find that a defendant knowingly and intelligently waived his right despite a low intelligence level. See *People v. Scott*, 148 Ill. 2d 479, 511-12 (1992) (finding a valid waiver of his rights where the defendant indicated that he understood them and gave responsive answers to questions, despite having an IQ of 75 and suffering from schizophrenia). It is also noteworthy that Richardson's mother was with him throughout the questioning, and she never suggested to any of the officers or assistant State's Attorney that her son was mentally impaired or would not be able to understand his rights. Richardson's claim that his inability to spell his girlfriend's name, "Cyntoria," demonstrated that he suffered from a mental impairment is not persuasive.

¶ 21    We also hold that Richardson failed to make an arguable claim that there was a reasonable probability that the outcome of the trial would have been different had the videotaped

confession been suppressed. As we found in our decision on direct appeal following remandment from the supreme court, the evidence against defendant was overwhelming. *Richardson*, 401 Ill. App. 3d at 54. As the State points out, Richardson's confession was not the only evidence of his guilt that was introduced. Richardson's daughter was in good condition when she was left in defendant's care, but when the first officer arrived on the scene, the unconscious infant had bite marks, black and blue eyes and a swollen cheek. Richardson told the responding officer that the baby had slipped in the bathtub the previous night and that he had to "whip" her after she vomited her cereal. James Franklin, who was 10 years old at the time, was present when Richardson spanked, punched, and shook his daughter. In his own trial testimony, Richardson admitted repeatedly shaking, biting, and hitting the infant on various parts of her body. The medical examiner testified that the baby sustained 61 different injuries, and his testimony regarding the locations and types of injuries found on the infant's body corroborated the testimony of Franklin and Richardson regarding how the injuries were inflicted. In light of the overwhelming evidence against Richardson, even absent the videotaped statement he made, we cannot say it is arguable that he was prejudiced by counsel's alleged deficient performance. Therefore, the petition lacks an arguable basis in law. *Hodges*, 234 Ill. 2d at 16. Accordingly, summary dismissal of the petition was proper.

¶ 22     In reaching this conclusion, we find *People v. Turner*, 56 Ill. 2d 201 (1973), *People v. Bernasco*, 185 Ill. App. 3d 480 (1989), and *People v. Redmon*, 127 Ill. App. 3d 342, 347 (1984), relied on by Richardson, distinguishable from this case. In all three cases, the records were, at best, unclear regarding whether the defendants understood their rights, and the reviewing courts found that they had not knowingly and intelligently waived their *Miranda* rights. See *Turner*, 56 Ill. 2d at 206-07 (police were aware the 25-year-old defendant with an IQ of 70 had a history of mental deficiency, and there was no evidence showing that the defendant's request for an attorney prior to his polygraph examination was ever relayed to police); *Bernasco*, 185 Ill. App. 3d at 483-84, 491 (the 17-year-old defendant had an IQ of 80, had no prior experience with the criminal justice system, was interrogated outside the presence of a parent, and did not understand his rights or what "waiver" meant); *Redmon*, 127 Ill. App. 3d at 346, 350 (the 17-year-old defendant had an IQ of about 70, and the court held that there was obvious confusion concerning his rights). Unlike the above cases, Richardson understood and explained each right, had been previously arrested and adjudicated delinquent, and had his mother with him during the interrogation.

¶ 23                                    SUPPLEMENTAL ANALYSIS

¶ 24     We now have the benefit of our colleague's views which were not available to us when this order was originally filed on October 22, 2014. *People v. Richardson*, 2014 IL App (1st) 113075-U. We respond briefly. We will not address the dissent's extended criticism of perceived defects in the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)), the wisdom of the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)) or the ability of juveniles to waive their *Miranda* rights, as those issues have never been raised or briefed by the parties and thus are not before us.

¶ 25     As it pertains to this case, the dissent labels Richardson's defense counsel as "missing in action" and "ineffective in the extreme" based primarily on the assertion that she failed to present evidence of Richardson's mental capacity. *Infra* ¶¶ 44, 173. Such unnecessary rhetoric disserves the talented and dedicated lawyers who represent indigent defendants in this state.

The record reflects that Richardson's counsel was a member of the Homicide Task Force of the Cook County public defender's office, a division reserved for the most experienced, skilled and well-trained lawyers. See *People v. Simpson*, 204 Ill. 2d 536, 574-75 (2001); Ill. S. Ct. R. 714 (eff. Jan. 1, 2005; reserved eff. Jan. 1, 2011). At the time of the 2005 trial, Richardson's counsel had been a lawyer for nearly 20 years. While even the most experienced lawyers make mistakes, in order to ascribe to the dissent's views, we would have to believe that Richardson's counsel made a conscious decision to abandon her client. Such an accusation, which permeates the dissent, has far-reaching implications for a member of the legal profession and is one we should hesitate to level without compelling justification.

¶ 26    But far from being ineffective, Richardson's counsel, possessing virtually no evidence to work with, caused Richardson's jury to question whether it could convict him of a lesser offense (which, under the circumstances of this case, it could not). The fact that defense counsel's argument–in a case where the evidence established that defendant mercilessly beat an infant for 30 minutes inflicting injuries to her brain, virtually every major organ and multiple skeletal structures–caused this jury to hesitate to convict her client of first degree murder is a testament to counsel's talent and resourcefulness and she does not deserve the harsh criticism she receives from the dissent.

¶ 27    The fundamental presumption underlying the dissent is that there was evidence available that would have been favorable to Richardson if only his lawyer had bothered to obtain and present it. An analysis of the validity of that presumption begins with our earlier opinion in this case. There we observed that Richardson's ineffective assistance claim rested on two possibilities: (1) either his counsel, despite her many representations to the contrary to the trial court, failed to have him evaluated; or (2) counsel did have him evaluated, obtained information favorable to his defense and simply failed to use it. *Richardson*, 401 Ill. App. 3d at 47. Because those matters were outside the record in Richardson's direct appeal, we commented that they would be more appropriately addressed in a postconviction petition. *Id*. at 48.

¶ 28    But the suggestion that matters are more appropriately addressed in a postconviction petition and the conclusion that the petition ultimately filed states the gist of a constitutional claim are two different issues. Here, despite the dissent's emphasis on Richardson's *pro se* status and its characterization of Richardson's petition as "inartful" and "incomplete," an examination of the petition reveals that it is remarkably cogent and replete with legal arguments and citation to authorities. As the face of the petition reveals, Richardson was assisted by another inmate in preparing the petition, and while he did not have the assistance of counsel, he certainly managed to file a petition several iterations removed from the bare-bones petitions unrepresented prisoners usually file.

¶ 29    Moreover, analysis of the substance of the petition conclusively eliminates the first possible basis for Richardson's ineffective assistance claim: that his defense lawyer failed to have his mental capacity evaluated. Although we have excused Richardson's failure to provide a verification affidavit, we cannot overlook factual omissions or supply them ourselves. " '[W]hile a *pro se* petition is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent.' " *Hodges*, 234 Ill. 2d at 10 (quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008)). A postconviction petitioner's failure to either attach the necessary affidavits, records or other evidence or explain their absence is fatal

to a postconviction petition and " 'by itself justifies the petition's summary dismissal.' [Citation.]" *Delton*, 227 Ill. 2d at 255. Richardson would certainly know whether he was evaluated prior to the hearing on his motion to suppress. Yet, his petition does not allege that he was not evaluated, nor does he provide an affidavit attesting to that fact.

¶ 30    Therefore, the viability of Richardson's petition depends on the claim that his defense counsel did, in fact, have him evaluated, obtained evidence that would have been favorable to his defense and decided not to use it. But again, Richardson's petition does not contain facts to support such a claim. As the subject of the evaluation, Richardson would have been entitled to obtain a copy of it. Yet, Richardson does not attach a copy of his evaluation or explain any attempts he made to obtain it. So in order to find that Richardson's petition states the gist of a constitutional claim, we must assume that the evaluation produced evidence favorable to Richardson, without factual allegations or any evidence to that effect and no explanation for its absence. This is, again, a defect in the petition that the law does not allow us to excuse, just as courts do not excuse a postconviction petitioner's failure to articulate the substance of a missing witness's testimony claimed to be favorable. *People v. Harris*, 224 Ill. 2d 115, 142 (2007).

¶ 31    The petition claims that defense counsel was ineffective because she failed to *present evidence* of Richardson's mental capacity, a mantra adopted by the dissent. The unspoken assumption in that claim is that the evidence (presuming it existed) would have aided Richardson on either the motion to suppress or at trial. But the dissent does not articulate how defense counsel could have presented evidence of Richardson's mental capacity (presumably through the testimony of the mental health professional who evaluated him) without disclosing and opening the door to inquiry into the remainder of that expert's report, *i.e.*, Richardson's ability to understand and waive his *Miranda* rights (which was the stated purpose of the evaluation in the first place). See Ill. S. Ct. R. 413 (eff. July 1, 1982) (requiring defense disclosure of, *inter alia*, reports of mental health examinations). Given defense counsel's repeated representations to the court that she needed additional time to have Richardson evaluated, it is obvious that Richardson was, in fact, evaluated and the evaluator reached conclusions not helpful to Richardson's motion to suppress, thus readily explaining the lack of such evidence. While we do not assume that Richardson was smarter or had a higher IQ at the time of his suppression hearing, there is no reason to believe that he was less competent to understand and waive his *Miranda* rights at 16 than he was when he was found competent for sentencing at age 20. And if Richardson was capable of understanding and waiving his *Miranda* rights, it stands to reason that he was likewise capable of understanding right from wrong and the criminality of his conduct. Indeed, the evidence showed that on the day he killed his daughter, Richardson told the police and the downstairs neighbor that his daughter sustained injuries when she fell in the bathtub and claimed that she had bite marks on her when he picked her up from her mother's apartment. Richardson's efforts to deflect responsibility manifest a concomitant ability to form the requisite intent to commit first degree murder.

¶ 32    The dissent repeatedly criticizes defense counsel for failing to introduce evidence at the suppression hearing and at trial regarding Richardson's "family history." An effort by the defense to adduce evidence that Richardson was subjected to corporal punishment at the hands of his mother and that she was a drug addict would clearly have entailed evidence of matters collateral to both his ability to understand and waive his *Miranda* rights and the charges on trial. Richardson's low IQ and his unfortunate upbringing do not constitute legal defenses to

- 8 -

murder and the dissent does not cite any authority that so holds. Thus, Richardson was not entitled to a voluntary manslaughter instruction because, as the trial court correctly found, the brutal, prolonged beating of his daughter could not fairly be characterized as reckless conduct. *People v. DiVincenzo*, 183 Ill. 2d 239, 251 (1998) ("an involuntary manslaughter instruction is generally not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, shows that defendant did not act recklessly"); *People v. Daniels*, 301 Ill. App. 3d 87, 96 (1998) ("severe and vicious beatings of helpless victims cannot be described by any rational jury as involuntary manslaughter"). This was not, after all, a broken arm that was twisted in anger or a head injury that resulted from a single blow. Richardson's IQ and background were relevant to sentencing and that is where they were properly considered by the trial court, another undeserving target of the dissent's unwarranted criticism.

¶ 33    The presumption underlying Richardson's postconviction petition–that his lawyer was in possession of evidence regarding his mental capacity that would have been favorable to him and elected not to use it–is precisely the type of "fanciful" claim that is properly dismissed at the first stage. *Hodges*, 234 Ill. 2d at 16-17.

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 35    Affirmed.

¶ 36    PRESIDING JUSTICE PUCINSKI, dissenting.

¶ 37    This is wrong.

¶ 38    I disagree with the majority and believe that they are wrong on the letter of the Post-Conviction Hearing Act as it is written and the spirit which created it.

¶ 39    This matter is before us on defendant Andre Richardson's appeal of the trial court's denial of his *pro se* postconviction petition at the first stage as frivolous and without merit.

¶ 40    He argues that his defense attorney was ineffective because she did not present an evaluation of his mental ability in support of his motion to suppress his video statement.

¶ 41    This case is a great example of the why the postconviction petition procedure as written and applied rings hollow.

¶ 42    Richardson, *pro se*, is doing what this court told him to do–he has filed a postconviction petition. Without assistance from any attorney he has missed several important issues that might be raised in his petition. "A determination as to whether trial counsel was ineffective as to this issue is a claim that would best be raised in a postconviction petition. Where information not of record is critical to a defendant's claim, it must be raised in a collateral proceeding." *People v. Richardson*, 401 Ill. App. 3d 45, 48 (2010) (*Richardson III*).

¶ 43    His defense attorney's failure to provide an evaluation of his mental ability and family history for the motion to suppress was bad enough. But then she failed to provide that information to the jury for its deliberations. And she failed to provide that information to the judge to give a basis for the request for the involuntary manslaughter instruction. And because there was no record, no information, no evidence presented to support the involuntary instruction, the judge refused to give it. Finally, without any evidence presented by the defense about Richardson's mental ability and family history when he was arrested at age 16, and only the presentence report and behavioral exam ordered by the judge after trial when he was 20, the judge did not have the option of considering his behavior when he was 16 at the time of the

crime, and instead relied on information about the 20-year-old standing in front of her when it came to sentencing.

¶ 44 The missing defense evidence had an impact on the motion to suppress (denied), the request for an involuntary instruction (denied, no evidence to support it), the jury's understanding of the element of the intent of the defendant in this case and on the sentence. It is a complete understatement to say that defense counsel was ineffective; she was missing in action. It is a worse understatement to say that Richardson was not prejudiced by his defense counsel's mistakes because every step of the way, from the trial court, through the appellate court and to the supreme court, every decision has emphasized that there was "no evidence" and "not a scintilla of evidence" to support the defense.

¶ 45 The trial court said: "[I]f there were any–and I will emphasize any–credible *evidence* to support a reckless act I would have given the involuntary instruction." (Emphasis added.) And: "There is *not one scintilla of evidence* that the defendant did anything but beat this child *** your motion for mistrial denied." (Emphasis added.)

¶ 46 In reversing *People v. Richardson*, 376 Ill. App. 3d 537 (2007) (*Richardson I*), the supreme court said: "However, at the suppression hearing, defendant presented *no evidence* or argument of any mental deficiency that would render his inculpatory statement involuntary, and the circuit court made no findings relating thereto." (Emphasis added.) *People v. Richardson*, 234 Ill. 2d 233, 263 (2009) (*Richardson II*). And: "Indeed, the issue of defendant's mental capacity was not raised until sentencing." *Id.* at 263 n.7. And: "After reviewing the entire record, we conclude that there is *no evidence* that defendant's will was overborne." (Emphasis added.) *Id.* at 265.

¶ 47 The appellate court said (on remand) in *Richardson III*: "[D]efense counsel offered *no evidence* to support the claim that defendant was unable to waive his Miranda rights ***." (Emphasis added.) *Richardson III*, 401 Ill. App. 3d at 47. "There is *not a scintilla of evidence* to support a finding that defendant acted recklessly rather than knowingly and intentionally." (Emphasis added.) *Id.* at 51. And, (on the issue of intent and admission of graphic photographs): "[W]e find that the trial court did not abuse its discretion in failing to give an involuntary manslaughter instruction because the *evidence* did not warrant such an instruction." (Emphasis added.) *Id.*

¶ 48                                    Postconviction Petition

¶ 49 The Illinois Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.* (West 2010)) provides that any person convicted of a crime may challenge the conviction or sentence where he can allege that a violation of the federal or state constitution has denied him a fundamental right. *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). The first step is for the circuit court to review the petition to see if it is "frivolous or is patently without merit" and, if so, to dismiss the case. 725 ILCS 5/122-2.1(a)(2) (West 2010). At this stage, the petitioner only has to present the gist of a constitutional claim. *People v. Edwards*, 197 Ill 2d 239, 244 (2001). At the first stage, all well-pleaded allegations are taken as true and liberally construed in favor of the petitioner. *People v. Brooks*, 233 Ill. 2d 146, 153 (2009). We review the dismissal of a petition at the first stage *de novo*. *People v. Brown*, 236 Ill. 2d 175, 184 (2010). A petition may be dismissed at the first stage only if it "has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." A claim

completely contradicted by the record is an example of an indisputably meritless legal theory. *Hodges*, 234 Ill. 2d at 16.

¶ 50    The Act provides that any claim not raised in defendant's original petition or in an amended petition is waived (725 ILCS 5/122-3 (West 2010)), and our supreme court has held that a claim that was not included in the postconviction petition cannot be raised for the first time on appeal (*People v. Pendleton*, 223 Ill. 2d 458, 475 (2006); *People v. Jones*, 213 Ill. 2d 498, 507-08 (2004)).

¶ 51    Our supreme court has observed a low threshold for survival of a petitioner's claims at the first stage, noting that most petitions at this point are drafted by defendants with little legal knowledge. *People v. Torres*, 228 Ill. 2d 382, 394 (2008). To that end, we must liberally construe the petition and defendant's allegations. *People v. Cruz*, 2013 IL App (1st) 091944, ¶ 48. The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim. *People v. Harris*, 224 Ill. 2d 115 (2007).

¶ 52    Further, the supreme court has explained that where a *pro se* defendant raises only one issue and could be said to have included other allegations, under our liberal construction the matter must be decided in defendant's favor. In *Hodges*, 234 Ill. 2d at 21, the defendant filed a *pro se* postconviction petition in which he alleged ineffective assistance of counsel and focused entirely on his self-defense theory. The State argued he made a choice of what to appeal and should be held to it. The supreme court said the petition "could be said to have included allegations regarding 'unreasonable belief' second degree murder" and found that the denial of the petition as frivolous and without merit because "defendant's legal theory of ineffective assistance was not indisputably meritless." *Hodges*, 234 Ill. 2d at 21-22.

¶ 53    Beginning with our *de novo* review (see *People v. Brown*, 236 Ill. 2d 175, 184 (2010) ("The summary dismissal of a postconviction petition is reviewed *de novo*.")), we look to the entire record to see if Richardson's allegation that his defense counsel was ineffective for failing to provide evidence of his mental ability to the attention of the court in his motion to suppress was reasonable. It is apparent that the failure to provide the evidence for the motion to suppress had a critical and damaging effect on the motion to suppress because without it the court had no evidence against which to weigh the voluntariness of his confession in the face of police abuse, and the appellate court had no evidence against which to weigh his waiver of his *Miranda* rights. In addition, looking at the entire record it is clear that the missing evidence impacted significantly and negatively on the defense theory that there was no intent to murder, the motion for a directed finding, the request for an involuntary manslaughter instruction, the motion for a mistrial and on sentencing. Taken as a whole, the record demonstrates clearly that defense counsel's failure at one point had a disastrous ripple effect on the entire trial.

¶ 54    Going to Richardson's claim that his counsel was ineffective because she did not perfect the argument on the motion to suppress with evidence that his confession was not voluntary, it is clear that the supreme court and appellate court did in fact consider this matter and ruled against Richardson; however, it is also clear that Richardson's proof of this fact is *de hors* the record and cannot be brought to light without the evidentiary hearing at the second stage of this petition, which is what this court told him to do.

¶ 55    First, Richardson's allegations in his petition must be taken as true unless rebutted by the record, which they are not. *Brown*, 236 Ill. 2d at 189 (quoting *People v. Coleman*, 183 Ill. 2d 366, 385 (1998)). Here the record is crystal clear that defense counsel did not present any

evidence of his mental ability. And, it is also clear that his only evidence of counsel's ineffective performance is outside the record in this case.

¶ 56 Recognizing that Richardson is exactly the kind of defendant the supreme court was considering in *Torres*, 228 Ill. 2d 382, *i.e.*, an uneducated, immature defendant with limited legal knowledge, and overlapping that with the fact that the Act itself prohibits any new claims on appeal of the dismissal of his first-stage petition, we see that the Act has effectively created a trap for the Richardsons of our state. We are, in effect, saying: "Do it yourself without any help, and do it right because if you blow it on the original petition your petition will be tossed out. We won't tell you that you can ask to amend your petition, and you won't get a lawyer to help you amend it." And then, to make matters worse–if they could be–we require the same judge who ruled against the defendant every step of the way to decide if the petition is frivolous and without merit.

¶ 57 Our supreme court has correctly pointed out that there is no constitutional guarantee of the right to a collateral action against a conviction, nor is there a right to an attorney if such action is permitted by statute, even when the issue itself is ineffective assistance of counsel. See *People v. Ligon*, 239 Ill. 2d 94 (2010). However, the *Ligon* court also held that "where *** the record is insufficient because it has not been precisely developed for the object of litigating a specific claim of ineffectiveness raised in the circuit court, thereby not allowing both sides to have an opportunity to present evidence thereon, such a claim should be brought on collateral review rather than direct appeal." *Ligon*, 239 Ill. 2d at 105 (citing *People v. Bew*, 228 Ill. 2d 122, 134 (2008), citing *Massaro v. United States*, 538 U.S. 500, 504-06 (2003)).

¶ 58 So, our supreme court has said that matters outside the record must be brought in a postconviction petition. And, that under the Act as it is written, the defendant does not get an attorney to help at the first stage. That does not mean that the Act as written is right. The Act, to use Justice Freeman's term (used considering the Act in another context) is a "gotcha" (see *People v. English*, 2013 IL 112890, ¶ 55 (Freeman, J., specially concurring, joined by Burke, J.)).

¶ 59 The *pro se* petition " 'is not expected to set forth a complete and detailed factual recitation, it must set forth some facts which can be corroborated and are objective in nature or contain some explanation as to why those facts are absent.' " *People v. Hodges*, 234 Ill. 2d 1, 10 (2009) (quoting *People v. Delton*, 227 Ill. 2d 247, 254-55 (2008)). The *pro se* petition can be dismissed as frivolous and without merit "only if the petition has no arguable basis either in law or in fact." *Hodges*, 234 Ill. 2d at 12.

¶ 60 This petition is not frivolous. It has merit. My colleagues on the majority are ignoring the obvious. Defense counsel was ineffective. The trial court, the appellate court and the supreme court all referenced the fact that *no evidence* of his mental ability was presented. And appellate counsel was equally ineffective for failing to raise several significant issues that should have been raised. Richardson's petition should be allowed to go to the second stage with an attorney who can help him amend his petition to identify all the ways this trial went wrong.

¶ 61 It is no consolation that Richardson has the legal ability to file a successive petition, since in order to do that he will need leave of court, under tighter standards. 725 ILCS 5/122-1(f) (West 2010). This is an unlikely possibility, since, again, it has to go to the same judge who denied the first petition and ruled against Richardson during the trial.

¶ 62 It is ironic that this judge in particular should find this petition frivolous and without merit since she so convincingly repeated that there was *no evidence* presented by the defendant to

support his case. If there was no evidence presented by defense counsel, yet there were findings four years later in his presentence evaluation as to his mental ability, the defense was at least arguably ineffective. "At the first stage of proceedings under the Act, a petition alleging ineffective assistance of counsel may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Hodges*, 234 Ill. 2d at 17). I believe it is more than arguable that defense counsel's performance fell below an objective standard of reasonableness and it is clearly arguable that the defendant was prejudiced by this ineffective representation.

¶ 63    And, let us not forget that a ruling on the initial postconviction petition has a *res judicata* effect with respect to all claims that were raised or could have been raised in the petition. *People v. McDonald*, 364 Ill. App. 3d 390, 392-93 (2006). The Act provides that any claim of substantial denial of constitutional right not raised in a defendant's original postconviction petition is waived. 725 ILCS 5/122-3 (West 2010).

¶ 64    So, a defendant like Richardson is expected to roll his constitutional dice. He gets one roll. This is Illinois's constitutional equivalent of Sky Masterson's all-or-nothing-roll in *Guys and Dolls:* With the system taking the place of the house on this roll, the odds are way in favor of the house. And this is a country, and a state, in which our fundamental guiding principle is that even bad guys have rights. More bluntly, it is a constitutional craps game.

¶ 65    What is shocking is that the first-stage petition, usually prepared *pro se* by the defendant, is the linchpin for the whole postconviction procedure, and it is so totally susceptible to the traps of the Act.

¶ 66    With 96,000 attorneys in Illinois, it is hard to believe that none of them are able and willing to provide *pro bono* assistance at this first stage. Recognizing that the State Appellate Defender is already overburdened, it is clear that no one wants to put more responsibility on that office. Yet, as with this case, once the first-stage petition was tossed, the State Appellate Defender was appointed anyway to represent Richardson on the appeal of that order. Now, however, their hands are tied to the petition that Richardson so inartfully and incompletely prepared. Richardson could never have been expected to challenge his defense attorney for ineffectiveness on other matters, nor could he be reasonably expected to challenge his appellate attorney for the continuation of that ineffectiveness. Our state promises a hearing on his constitutional issues without any meaningful way for most *pro se* petitioners to get there. The Act, as it is written, is not working.

¶ 67                                    Procedural History
¶ 68    This postconviction petition should be allowed to proceed to the second stage because it states the gist of a constitutional issue and this court told Richardson to do it this way.

¶ 69    After remand from the supreme court, our colleagues in the First District said:

> "Whether an evaluation was in fact completed and what the results of that evaluation might be are matters outside the record in this case. *** A determination as to whether trial counsel was ineffective as to this issue [failure to present evidence of an evaluation at the suppression hearing] is a claim that would best be raised in a postconviction petition. Where information not of record is critical to a defendant's claim, it must be raised in a collateral proceeding." *Richardson III*, 401 Ill. App. 3d at 48.

¶ 70     A brief review of the procedural history of this case is needed to understand why I feel this dissent is necessary.

¶ 71     Richardson was arrested in February 2001. He was found guilty of murder in the death of his one-year-old daughter in a jury trial in January 2005.

¶ 72     He filed a direct appeal and raised four issues, discussed below.

¶ 73     The appellate court reversed on the question of whether his confession was voluntary because he had been injured while in police custody, but it did not decide the other three issues. *Richardson I*, 376 Ill. App. 3d 537.

¶ 74     The State was granted leave to appeal and the Illinois Supreme Court reversed the appellate court on the voluntariness of the confession based on his injury while in police custody and remanded to this court to consider the remaining three issues. *Richardson II*, 234 Ill. 2d 233.

¶ 75     The appellate court, in *Richardson III*, 401 Ill. App. 3d 45, affirmed the trial court on the three remaining issues, finding: (1) trial counsel's failure to call an expert during the suppression hearing concerning Richardson's mental impairment and its effect on his ability to waive his *Miranda* rights did not fall below an objective standard of reasonableness; (2) defendant was not entitled to a jury instruction in involuntary manslaughter, and (3) the trial court's admission of 27 graphic photos of the dead child depicting her internal injuries was not an abuse of discretion.

¶ 76     There was no further appeal on those three issues.

¶ 77     Richardson then filed a *pro se* postconviction petition alleging ineffective assistance of counsel for failure to provide an evaluation to support the motion to suppress where his mental disability affected his ability to waive his *Miranda* rights.

¶ 78     The trial court denied the postconviction petition as frivolous and without merit.

¶ 79     But remember, the supreme court heard the question of the confession as to its voluntariness because of his *injury* while in police custody. The supreme court did not consider whether the failure to provide an evaluation affected his ability to *knowingly waive* his *Miranda* rights because the appellate court, in *Richardson I*, did not consider that question. Nor did the supreme court decide on the issue of the involuntary manslaughter instruction, since it was not before that court. And while the appellate court on remand did consider these issues and ruled against the defendant, it was that very court that told Richardson to file a postconviction petition because the proof of his allegations is not in the record and so can only be determined in a collateral proceeding after an evidentiary hearing.

¶ 80     Richardson appealed the denial of the postconviction petition and the State Appellate Defender was appointed to represent him.

¶ 81     On appeal the majority would affirm the denial of the postconviction petition.

¶ 82                              Ineffective Assistance of Defense Counsel

¶ 83     "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant. [Citation.] More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Cathey*, 2012 IL 111746, ¶ 23 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)); U.S. Const., amend. VI.

¶ 84    In Richardson's case the defense attorney failed to provide evidence of his mental capacity or family environment. At the suppression hearing this evidence would have been important for the judge to consider. During the trial this evidence would have been significant for the jury to consider in evaluating his behavior and whether the State had proved the element of intent on the first degree murder charge. In the instruction phase this evidence was fundamental to the request for the involuntary manslaughter instruction. There was no strategic purpose for failing to provide this evidence. See, *e.g.*, *People v. Diaz*, 2014 IL App (1st) 123400-U, ¶ 22; *People v. McPhee*, 256 Ill. App. 3d 102, 110-11 (1993). I am persuaded by the reasoning in *Diaz*, that where such evidence "provides the strongest defense to the State's case, the defendant has shown that his counsel provided objectively unreasonable assistance." *Diaz*, 2014 IL App (1st) 123400-U, ¶ 22; see *Nulle v. Krewer*, 374 Ill. App. 3d 802, 806 n.2 (2007) (although opinion is unpublished, the court is free to deem it persuasive). In this case the defense was lack of intent to murder. Clearly his mental ability and family history provide compelling evidence to support the defense theory. Leaving it out cannot be strategic.

¶ 85    My colleagues on the appellate court on remand in *Richardson III* said that they would not speculate about the evidence that was not there. However, we have the fact that four years after the crime, in 2005, Richardson was evaluated and found to be have "a full scale IQ of 61, which falls within the extremely low range of intellectual functions and ranks him in the 0.5th percentile," and that he was "in the upper echelon of mild mental retardation" and had a third-grade reading level after four years of special education while incarcerated at the Cook County department of corrections (CCDOC). Can anyone really believe that any evaluation done in 2001, four years earlier, would have shown him to be *less* mildly mentally retarded, or have a *higher* IQ, or know how to read better? We are not supposed to leave common sense at the door.

¶ 86    The second prong of the *Strickland* test is whether the defendant was prejudiced by the ineffective assistance of counsel. To establish prejudice "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. For Richardson, that reasonable probability is shown from a number of facts from his trial: (1) in denying the motion to suppress the court found there was *no evidence* to support Richardson's claim that his video statement was the result of the physical abuse at the police station; (2) in denying the motion for a directed finding the court had *no evidence* on which to evaluate the State's proof of Richardson's intent to murder beyond a reasonable doubt; (3) in denying the involuntary manslaughter instruction the court specifically found that there was *no evidence* to support recklessness; (4) the jury itself sent out a note asking if it could consider a lesser offense; (5) in sentencing the court had *no evidence* presented by the defense to consider when weighing the culpability of the 16-year-old offender arrested in 2001 as compared to the 20-year-old defendant on trial in 2005; (6) the supreme court had *no evidence* to support a finding that the confession was involuntary; (7) the appellate court had *no evidence* to support an involuntary instruction; and (8) the appellate court had *no evidence* to support defendant's argument that his mental impairment affected his ability to waive his *Miranda* rights.

¶ 87    This cascade of events demonstrates prejudice to the defendant because of defense counsel's failure to provide *evidence* of his mental ability and family history.

- 15 -

¶ 88    I believe Richardson has met both prongs of the *Strickland* test.

¶ 89                                    Postconviction Traps

¶ 90    The appellate court in *Richardson III* told him that a postconviction petition was the way to get the failure of his defense counsel to provide an evaluation of his mental condition in the suppression hearing considered since it would require dealing with evidence that was outside the record.

¶ 91    And Richardson, *pro se*, followed the court's advice. Only he did not raise other defects in the defense which bolstered his claim that his constitutional right to effective assistance of counsel had been violated in his *pro se* postconviction petition; for example, the fact that the missing evaluation had a significant impact on not only the motion to suppress his confession but also and perhaps more importantly on his defense to the element of intent to murder, on the matter of the trial court's refusal of an involuntary manslaughter instruction and later on sentencing. Nor could he have known that his appellate counsel was also ineffective for not raising these and other matters.

¶ 92    Then *after* the *pro se* petition was denied, the court appointed an attorney to represent him on the appeal of the denial of the petition, but it is already too late because this appellate counsel is stuck with the petition he filed, not the one he could have filed if he had been given an attorney to help him prepare and/or amend his postconviction petition in the first place.

¶ 93    More seriously, this attorney cannot now add to his petition the ineffective assistance of appellate counsel in the direct appeal.

¶ 94    Richardson is caught in Illinois criminal justice's postconviction trap and he is being denied justice, access to justice and any sort of fair play by the rules that are in place today.

¶ 95    We have the resources to appoint an attorney to assist him in *appealing* the denial of a *pro se* petition that he messed up. But we deny him the attorney to get the petition right in the first instance.

¶ 96    That is fundamentally unfair, but it is particularly vexing when you consider: (1) our absolute belief that every trial should be fair; (2) incarcerated defendants who are preparing *pro se* postconviction petitions are totally at the mercy of their prison situation and literally cannot just go to the law library when they want, or get assistance in prison; and (3) may be, like Richardson, a person of limited education and limited intelligence.

¶ 97    The problem is that Richardson, now about 29, is no longer the skinny child he was at trial. And, his progress in reading while he was at Cook County jail for four years waiting trial indicates that by the age of 29, if he was allowed to continue with any kind of school in prison, he will be more articulate and hopefully have a higher reading level: all of which will make it much harder to see the child-father that was actually arrested in 2001 and on trial in 2005. Richardson acting *pro se* is in no position to evaluate all the parts of his trial below or his direct appeal and is stopped by the supreme court ruling in his case from re-arguing the voluntariness of his confession.

¶ 98    If Richardson is not allowed to go forward with this *pro se* postconviction petition, to the second stage where he will be appointed an attorney to amend his petition, his only remaining remedy will be to seek permission to file a successive postconviction petition, which is a much steeper climb.

¶ 99    For all of the reasons above and below, I strongly believe that Richardson should be allowed to proceed to the second stage, be assigned an attorney and be allowed to file an amended postconviction petition.

¶ 100   Trying to find your way through the legal complications is daunting enough for qualified and skilled appellate attorneys; expecting *pro se* defendants to do it is just paying lip service to the whole notion of postconviction petitions: the law says they are entitled to file one, but the system tells them that when they do not do it exactly right: "Oh well, too bad, you're out of luck." This is not access to justice.

¶ 101                                    Facts of the Case

¶ 102   Andre Richardson was found guilty by a jury of the first degree murder of his daughter, Diamond. The one-year-old child suffered multiple serious injuries from Richardson and died at about 11:45 p.m. on February 9, 2001. Richardson was arrested at 3:30 p.m. on February 9, 2001 and charged with child abuse. He was held at the police station until about 7:30 p.m., when he was questioned by detectives. It is uncontradicted that between his arrest and 7:30 p.m. he was injured at the hands of police personnel in the police lockup resulting in a visibly black and swollen left eye. He was 16 at the time. His mother was called to the station at about 5 p.m.; she saw him and saw his eye was not injured but was not allowed to talk him. She was told she had to go home and bring proof of his age. When she returned she was not allowed to talk with him, but she did see him and observed the injury to his eye. When Detective Zalatoris saw Richardson at about 7 p.m. he saw the injury to his eye but did not inquire about it or do anything about it. Youth officer Nolan saw Richardson about 7:30 or 8 p.m. and saw that his left eye was swollen, that he was still with arresting officer Hayes, and that the mother was at the station. Nolan did not do anything about Richardson's eye injury. The police department's Office of Professional Standards (OPS) had been called and was beginning its investigation of the injury to the juvenile; however, OPS was not allowed to talk to Richardson. Nolan gave the defendant his *Miranda* warnings; however, there is no signed waiver from the 16-year-old or his mother. Nolan called felony review and told Richardson he could be tried as an adult but did not tell him what the charge would be. Detectives O'Connell and Zalatoris along with youth officer Nolan and the defendant's mother saw Richardson at about 9:08 p.m. The police questioned him for about an hour, all noticing his visibly injured eye. Youth officer Nolan read the *Miranda* warnings again. Again, no written waiver was obtained from Richardson or his mother. No one told Richardson what the possible charges might be. Detective Zalatoris testified that the mother did not talk to Richardson before the actual questioning that began at 9:08 p.m. At that time the detectives and youth officer questioned Richardson for about an hour. The mother was present for this session. It was after the questioning that she was left alone with her son.

¶ 103   At 10 p.m. Assistant State's Attorney Heil arrived and talked to Detectives O'Connell and Zalatoris and youth officer Nolan. Heil then went to the hospital to check on the condition of Diamond. He learned that Diamond died at about 11:45 p.m.

¶ 104   At 12:28 a.m. on February 10, 2001 Heil returned to Area 1 and began questioning Richardson. Richardson's mother, Detective O'Connell and youth officer Nolan were present. Heil testified that he gave Richardson his *Miranda* warnings, but again there is no written waiver; that he took no notes; that he told the defendant he could be charged as an adult because of the seriousness of the matter; and that the officers left at that time. Heil did not tell

the defendant that he would be charged with murder, although he did tell the defendant that his child had died. Although the defendant's mother testified that Nolan grabbed her, pushed her, shouted at her, called her a "bitch" and told her to shut up, youth officer Nolan testified that he did none of those things and that he did not tell Richardson that he would be charged with child endangerment, that he could go home if he talked, or that he would never go home.

¶ 105    At 9:27 a.m. on February 10, 2001 Richardson gave a video statement to Heil, at which his mother and youth officer Nolan were present. Richardson and his mother both signed the consent to video the statement, but that consent does not include *Miranda* waivers. Richardson was led through his *Miranda* warnings in the video statement and agreed that he understood each of them; however his mother was not asked if she agreed, and did not speak up in disagreement during the video.

¶ 106    Richardson had by then been in custody since 3:30 p.m. the day before and had a significant injury to his eye.

¶ 107                              Automatic Transfer to Adult Court

¶ 108    There is another significant and troubling aspect of this case.

¶ 109    The State's Attorney chose to charge Richardson with first degree murder.

¶ 110    This is the State's Attorney's prerogative, and in 2001 under Illinois law, once a juvenile age 16 was *charged* with first degree murder, he or she was automatically transferred to adult court.

¶ 111    This means that all of the discretion is with the State's Attorney as to the charge, before the State's Attorney has ANY information about the juvenile.

¶ 112    Unlike the permissive transfer provisions, which require a hearing before a juvenile judge who will take evidence into consideration in deciding whether the juvenile should be transferred to adult court, the mandatory transfer act has no such oversight by anyone. A State's Attorney for whatever reason can decide the charge and the juvenile is completely and effectively at the mercy of the adult system from that moment forward. There are no published rules or protocols for the charging decision, there is no judicial review and there is no appeal.

¶ 113    Much has been written about the difference between juveniles and adults. And no one denies that juveniles commit heinous crimes. Even in this case no one denies that Richardson inflicted terrible injuries to his daughter which led to her death.

¶ 114    There are two recent developments that may change this landscape.

¶ 115    As recently as October 2014 the Illinois Supreme Court upheld the constitutionality of the mandatory juvenile transfer provision, although reluctantly, in *People v. Patterson*, 2014 IL 115102, with a strong dissent from Justice Theis. In recognizing modern research showing the impact that juveniles' youth has on their judgment and actions, our supreme court wrote: "We do, however, share the concern expressed in both the Supreme Court's recent case law and the dissent in this case over the absence of any judicial discretion in Illinois's automatic transfer provision. While modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions (see, *e.g.*, *Roper*, 543 U.S. at 569-70; [citation]), the automatic transfer provision does not. Indeed, the mandatory nature of that statute denies this reality. Accordingly, we strongly urge the General Assembly to review the automatic transfer provision based on the current scientific and sociological

evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases." *Patterson*, 2014 IL 115102, ¶ 111.

¶ 116   And, while *Patterson* was working its way through the courts, the Illinois legislature was considering House Bill 4538, legislation that would eliminate automatic transfers and require a hearing before a judge before a transfer to adult court could be made.

¶ 117   In an important move, House Bill 2404 (98th Ill. Gen. Assem., House Bill 2404, 2013 Sess.) was recently signed into law, directing 17-year-olds charged with felony crimes to be tried in juvenile courts where rehabilitation is the goal.

¶ 118   This movement away from automatic transfers has the support of the Campaign for Youth Justice and the John Howard Association, and automatic transfers have been researched thoroughly and disapprovingly by the Illinois Juvenile Justice Initiative in their work, *Automatic Adult Prosecution of Children in Cook County*, in which the authors state: "More than 30 years' of studies have consistently demonstrated that categorical treatment of children as adults prevents rehabilitation and positive development, fails to protect public safety and yields profound racial, ethnic and geographic disparities." *Automatic Adult Prosecution of Children in Cook County, Illinois. 2010-2012* (Juv. Just. Initiative, Evanston, Ill.), Apr. 2014, at 3, *available at* http://jjustice.org/wordpress/wp-content/uploads/Automatic-Adult-Prosecution-of-Children-in-Cook-County-IL.pdf (hereinafter *Automatic Adult Prosecution*). While this research focused on the years 2010 to 2012, it showed a troubling pattern of racial disproportion in Cook County in automatic transfer cases. One is left to wonder if the racial disproportion from l982, the year that automatic transfers went into effect, to 2010 was any less significant or troubling. See *The Consequences Aren't Minor* (Campaign for Youth Just.), Mar. 2007, *available at* http://www.campaignforyouthjustice.org/images/nationalreports/consequencesarentminor/CFYJNR_ConsequencesMinor.pdf; *In Their Own Words: Young People's Experiences in the Criminal Justice System and Their Perceptions of Its Legitimacy* (John Howard Ass'n of Illinois), Dec. 6, 2014, *available at* http://thejha.org/words; John Maki, *OP-ED: It's Time to Abolish Automatic Transfer* (Juv. Just. Info. Exchange), Apr. 9, 2014, *available at* http://jjie.org/op-ed-its-time-to-abolish-automatic-transfer/.

¶ 119   Changing the law for future cases will not help Richardson; however, it is still important to note that there are many juveniles who committed crimes and were automatically transferred to adult court under the old law. We can only hope that in a manner consistent with the recent reviews of adult cases, State's Attorneys across the state will review their automatic transfer cases to see which, if any, in the wake of new understanding of juvenile behavior merit a review, and that courts will view the opportunity to take a fresh look at those cases as a chance to heed the lessons of science and apply them in the spirit of justice.

¶ 120   Richardson was charged with murder as an adult under section 5-130 of the Juvenile Court Act (705 ILCS 405/5-130 (West 2010)): "Excluded jurisdiction. (1)(a) The definition of a delinquent minor under Section 5-120 of this Article shall not apply to any minor who at the time of an offence was at least 15 years of age and who is charged with *** first degree murder ***. These charges and all other charges arising out of the same incident shall be prosecuted under the criminal laws of this State."

¶ 121   "Illinois has one of the most extreme 'automatic' prosecutorial transfer mechanisms. Most states require an individualized hearing either in juvenile court or a 'reverse waiver' hearing in adult court to try a child as an adult. Illinois, however, has no 'safety valve,' no hearing in either juvenile or adult court to review whether trial in adult court is appropriate in an

individual case. Only 14 states use such an extreme process to make this critical decision without any safety valves. In Illinois, a child is transformed into an adult through the mere filing of a charge, and the child remains stuck in adult court with no legal mechanism to trigger a hearing to consider his/her background to determine the appropriateness of adult court jurisdiction." *Automatic Adult Prosecution*, at 9.

¶ 122 While the automatic transfer law has been held constitutional by the Illinois Supreme Court in *Patterson*, *People v. J.S.*, 103 Ill. 2d 395, 405 (1984), and *People v. M.A.*, 124 Ill. 2d 135, 147 (1988), even with the evolving United States Supreme Court attitudes toward juveniles, we are still literally stuck with *Patterson*, *J.S.* and *M.A.* even while admitting that widely respected research would and probably should lead to a different result. This was the dilemma in *People v. Willis*, 2013 IL App (1st) 110233, a case in which I participated. There we acknowledged that the law is moving slowly toward revisiting the constitutionality of automatic transfer, while also admitting that as long as our supreme court maintains its views we are powerless to do otherwise.

¶ 123                                                                Youth

¶ 124 As recently as September 2014, the appellate court, in *People v. Sanders*, 2014 IL App (1st) 121732-U, quoted extensively from *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), and related cases, *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005). Although *Sanders* is unpublished and not precedential, I am persuaded by its discussion of the *Roper-Graham-Miller* scientific and sociological principles.

¶ 125 Sanders was 17 when he was charged with murder and attempt murder and was sentenced to consecutive sentences. He brought several challenges to his sentence, including the second successive postconviction petition that is the subject of the appellate court's Rule 23 order. In the process of challenging his consecutive sentences, Sanders also challenged the lengthy sentence he received–40 years for the murder and 30 years each for the two attempted murders for a total of 100 years–as unacceptable under the eighth amendment.

¶ 126 The appellate court wrote:

"In *Miller*, the United States Supreme Court explained at length the special concerns that arise whenever a court sentences a juvenile offender. First, the [Supreme] Court interpreted the holdings of *Graham* and *Roper v. Simmons*, 543 U.S. 551 (2005):

'*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, they are less deserving of the most severe punishments. [Citation.] Those cases relied on three significant gaps between juveniles and adults. First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. [Citation.] Second, children are more vulnerable … to negative influences and outside pressures, including from their family and peers; they have limited contro[l] over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievabl[e] deprav[ity]. [Citation.]

- 20 -

Our decisions rested not only on common sense–on what "any parent knows"–but on science and social science as well. [Citation.] In *Roper*, we cited studies showing that [o]nly a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. [Citation] (quoting Steinberg & Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psychologist 1009, 1004 (2003)). And in *Graham*, we noted that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds–for example, in parts of the brain involved in behavior control. [Citation.] We reasoned that those findings–of transient rashness, proclivity for risk, and inability to assess consequences–both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed. [Citation.] *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes. Because "[t]he heart of the retribution rationale" relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. [Citations.] Nor can deterrence do the work in this context, because the same characteristics that render juveniles less culpable than adults–their immaturity, recklessness and impetuosity – make them less likely to consider potential punishment. [Citation.] Similarly, incapacitation could not support the life-without-parole sentence in *Graham*: Deciding that a juvenile offender forever will be a danger to society would require mak[ing] a judgment that [he] is incorrigible–but incorrigibility is inconsistent with youth. [Citation.] And for the same reason, rehabilitation could not justify that sentence. Life without parole forswears altogether the rehabilitative ideal. [Citation.] It reflects an irrevocable judgment about [an offender's] value and place in society, at odds with a child's capacity for change. [Citation.]' " (Internal quotation marks omitted.) *Sanders*, 2014 IL App (1st) 121732-U, ¶ 26 (quoting *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2464-65 (2012)).

¶ 127    The appellate court continued:

"The *Miller* court then applied its observations to the case on appeal:

'Of special pertinence here, we insisted in these rulings that a sentence have the ability to consider the "mitigating qualities of youth." [Citation.] Everything we said in *Roper* and *Graham* about that stage of life also appears in these decisions. As we observed, youth is more than a chronological fact. [Citation.] It is a time of immaturity, irresponsibility, impetuousness[,] and recklessness. [Citation.] It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage. [Citation.] And its signature qualities are all transient. [Citation.] *Eddings i*s especially on point. There, a 16-year-old shot a police officer point-blank and killed him. We invalidated his death sentence because the judge did not consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance. We found that evidence particularly relevant–more so than it would have been in the case of an adult offender. [Citation.] We held: "[J]ust

- 21 -

as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered" in assessing his culpability. [Citation.]' " (Internal quotation marks omitted.) *Sanders*, 2014 IL App (1st) 121732-U, ¶ 27 (quoting *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467).

¶ 128   The appellate court found that the trial court did not consider the special circumstances of youth that often make lengthy sentences particularly inappropriate for youthful offenders, and found that Sanders showed he had a "reasonable probability" of a shorter sentence "if the trial court [had] correctly understood the eighth amendment as it applie[d] to the punishment of juvenile offenders." *Sanders*, 2014 IL App (1st) 121732-U, ¶ 30. The case was remanded for resentencing.

¶ 129   The appellate court appears to have put the *Roper-Graham-Miller* cases in a special compartment where offenders like Richardson cannot use the same logic to show that his attorney was ineffective for failing to provide any evidence of his culpability based on his mental ability, his family or social history, his youth, or other factors. The *Roper-Graham-Miller* cases are called sentencing cases, but they are really about culpability. If their analysis depends on evidence of youthfulness and its effects, then what can we say about a defense attorney who provides NO EVIDENCE WHATSOEVER about a defendant's youthfulness and its effects? That evidence was crucial in determining Richardson's culpability. Surely, leaving it out was ineffective assistance of counsel and could not have been strategic.

¶ 130                                   Motion to Suppress

¶ 131   Richardson filed a motion to suppress his video statement as involuntary as a result of police coercion. The motion was denied. On direct appeal the issue was raised again along with three others, and the appellate court reversed and remanded on that issue. *Richardson I*, 376 Ill. App. 3d 537. The supreme court allowed the State to appeal and reversed the appellate court, ruling that the video confession was voluntary and not coerced. The supreme court remanded back to the appellate court for consideration of the remaining three issues: (1) that he received ineffective assistance of counsel; (2) the trial court erred in refusing to instruct the jury on the lesser-included offense of involuntary manslaughter; and (3) he was denied a fair trial when autopsy photographs were published to the jury and sent to the jury room during deliberations. The appellate court on remand affirmed on all three of those remaining issues, stating that there was *no evidence* in the record to support his claim on the ineffective assistance of counsel and the involuntary manslaughter instruction issues. The appellate court affirmed on the photographs, saying they were there to show intent; however, without the evidence of his mental ability the intent shown by the photographs becomes another matter of ineffective assistance of counsel and the failure of the appellate counsel to frame it that way is another example of the ineffective assistance of appellate counsel.

¶ 132   In his direct appeal Richardson argued that he was denied his right to effective assistance of counsel where counsel failed to offer expert testimony concerning his mental impairment during the motion to suppress hearing. His defense attorney *argued* the issue of his mental ability in the motion to suppress, in the motion to reconsider the denial of the motion to suppress, in the motion for a new trial and in the motion to reconsider the denial of a new trial.

¶ 133    However, his defense attorney *provided no evidence* or testimony about his mental capacity in relation to the motion to suppress, or even later in the trial as to the element of intent.

¶ 134    His appellate counsel did not frame any of those issues in terms of ineffective assistance of defense counsel.

¶ 135                    Confession, Motion to Suppress, Voluntariness

¶ 136    His first claim on appeal was based on the fact that his attorney, although asking for several continuances to obtain an expert evaluation of the defendant, never produced the evaluation, or expert testimony at the hearing on the motion to suppress.

¶ 137    His claim is bolstered by the fact that the presentence investigation ordered by the court after the trial and before sentencing identified several factors of concern: (1) he had no pending cases or warrants; (2) he had an aggravated battery as a juvenile which resulted in "probation satisfactorily completed"; (3) he is the youngest of five children; (4) his brother was shot to death; (5) he had no contact with his father; (6) this mother came home every day and hit and slapped him, and beat him with extension cords, belts, broom sticks, "anything she could get her hands on" if the house was not clean; (7) the mother drank a fifth of whiskey a day, and around the time Richardson was 12 developed a crack cocaine habit; (8) when Richardson was 12 he sold M&M's on the street and rapped on the train to make money for food; (9) he was illiterate when, after his arrest, he was transferred to CCDOC at the age of 17; (10) while at CCDOC he had, with the help of a special education teacher, achieved a third-grade reading level; (11) he was classified learning disabled during his entire time in Chicago public schools; (12) he attended five different grade schools; (13) there was the possibility of fetal alcohol syndrome; (14) from the age of 13 he had been drinking Jack Daniels and smoking PCP; (15) he had no gang affiliation; (16) while in jail (he was arrested at 16, the PSI was done when he was 17), his mother moved and he did not know her current address; and (17) his report from Forensic Clinical Services found him to be fit for sentencing, at age 20, and his psychological evaluation indicated that he had, at age 20 in 2005, a "full scale IQ of 61, which falls within the extremely low range of intellectual functioning and ranks him at the 0.5th percentile, when compared to his same aged peers (meaning that 99.5% of these individuals would likely do better on this test … Overall, Mr. Richardson appears to fall in the upper echelon of Mild Mental Retardation at this time. It should be noted that Mental Retardation is not necessarily a permanent condition and that with additional education and/or further life experience it is likely that he would shift into the Borderline range of intellectual functioning." (Dr. Neu report, May 12, 2005).

¶ 138    The appellate court declined to speculate about what a report on his mental ability at the time of his arrest at age 16, or even between 16 and 17, when his defense counsel was asking for continuances to get an evaluation, would prove.

¶ 139    In one hearing defense counsel told the court that the person who went to the jail to do the evaluation was denied access to Richardson, but counsel did not provide further information. However, by the time the trial was actually held, in 2005, the defendant was 20 years old. It is simply inconceivable that his mental ability was *better* at age 16 to 17 than it was at 20, so it does not take speculation, it takes common sense, to understand the disastrous effect of the defense counsel's failure to provide the information soon after defendant was arrested, not

- 23 -

only to lay the foundation for the motion to suppress, but also to challenge the element of intent in the murder charge, to support the involuntary instruction, and for sentencing.

¶ 140    Both the appellate court and the supreme court focused on the motion to suppress because that is the only argument his appellate attorney made regarding his mental capacity.

¶ 141    This was particularly important information for the court to have when it ruled on the motion to suppress, and the importance of the missing information does not end there. Defense counsel did not present it, either through an expert witness or from occurrence witnesses in Richardson's life, his mother, friends, teachers, or principals. The necessary evidence was never presented at all.

## Waiver of Rights by Minors

¶ 143    The fact that courts continue to hold that *any* child is capable of knowingly and voluntarily waiving his or her right to be silent or waiving his right to have an attorney is the flip side of the *Roper-Graham-Miller* analysis and begs for robust argument.

¶ 144    No child in Illinois under the age of 18 can vote, join the military, get a passport on his own, marry, buy liquor or lottery tickets yet we continue to hold that children can voluntarily waive their most fundamental constitutional rights when in the custody of police, certainly a frightening and daunting experience. Ask any parent of a child under the age of 18 if his or her child could fully and completely understand the nuances of the *Miranda* warnings *and* the effect of waiving them and it is hard to see any thoughtful parent saying: "Sure!" no matter how precocious the child is. Better yet, ask yourself if your own 18-or-under child could fully appreciate all the ramifications of that waiver, something so slippery that a child could agree without even taking time to reflect on the words themselves or their effect: Would you want your own child to be irretrievably bound by his or her waiver of the most basic and fundamental rights guaranteed by our Constitution?

## Youth Officer

¶ 146    We take artificial comfort in the fact that children cannot be interviewed without a youth officer or interested adult. But we fail to question what the youth officer's job and loyalty really are. Could the youth officer tell the child, for example: "Look, don't say anything until you get a lawyer"? Youth officer Nolan testified that he was assigned to investigate the child abuse to Diamond and that he met with the detectives at the scene and went to the hospital to check on the child's condition. He testified that youth officers are responsible for processing juvenile arrests, investigating child abuse and offenses against children and looking for missing persons. He testified that part of his job was to ensure that a juvenile suspect was treated properly while in custody.

¶ 147    But youth officer Nolan left this juvenile defendant, who was still not being charged as an adult, alone from 3:30 p.m. to about 7:30 or 8 p.m. at the police station where he was punched by police personnel. Further, youth officer Nolan did not talk to the desk sergeant or the watch commander about the injury to the juvenile suspect, nor did he do anything to seek medical attention for the juvenile. We cannot say with any confidence that youth officer Nolan was protecting the rights of this juvenile suspect. In fact, it appears clear from his assignment that he was there to investigate what happened to Diamond, which is a troubling conflict of interest to his role regarding Richardson.

¶ 148    When asked if he was present to safeguard Richardson's rights during questioning while Richardson's mother was also present, Nolan answered that he was there because it was part of the child abuse investigation.

¶ 149    Somehow we buy into the idea that the youth officer is there to protect the juvenile's rights? How exactly was that done in this case where Nolan left Richardson alone in custody where he was punched and then Nolan did nothing about the injury? How exactly was this done when Nolan clearly believed his primary responsibility was to investigate what happened to Diamond, not to protect Richardson? When you get right down to it, if the youth officer is there to safeguard the juvenile's rights, why in the world would any juvenile ever answer questions without an attorney? What exactly are those safeguards?

¶ 150    In this case in particular, youth officer Nolan testified that he was simultaneously investigating first the child abuse and then the death of Diamond, while also sitting in with Richardson during the questioning.

¶ 151    Neither the defense counsel nor appellate counsel argued that the youth officer's failure to protect Richardson from physical harm, and that leaving him alone in the police station, helped create an atmosphere of coercion that led to Richardson's statements or that youth officer Nolan had an impermissible conflict of interest in this matter.

¶ 152                                    Interested and Competent Adult

¶ 153    Then we look at the interested adult. Someone in this case should have questioned whether the parent with Richardson was actually an interested and competent adult, and capable of protecting his rights. We want to believe that parents will do that and are capable of it, yet we know from experience that not all parents are equal. Some are drug addicts, some are alcoholics, some have criminal cases of their own they need to protect, some are just dopey, some have already given up on their own child, more likely from poor parenting than because the child is incorrigible. Who *are* these interested adults? Why do we persist in believing that a parent, *any* parent, is good enough?

¶ 154    In Richardson's case his mother was there and wanted to leave. We know from the pre-sentence report that she was a crack cocaine addict and alcoholic. What we see in the video as a submissive mother may just as well have been a mother who was coming down from her own high and was physically and mentally ineffective when it came to her son.

¶ 155    Further, this is the same mother who pushed him out to live with her boyfriend's sister to babysit that woman's three children. We do not know why Richardson was not living with his mother. Maybe he was better off, since she beat him regularly, but he was still legally a child of 16, with no loving mother and no connection at all to his father.

¶ 156    "In situations where an adult other than a member of the police or prosecution was present at the custodial interrogation of a juvenile, challenges by the juvenile to the admission of evidence based on the incompetency of the adult can be roughly grouped into three categories: (1) challenges based on an insufficiently close bond between the adult and the juvenile (a lack of interest); (2) challenges based on the adult's failure to understand the situation; and (3) challenges based on a conflict of interest between the juvenile and the adult." Andy Clark, *"Interested Adults" With Conflicts of Interest at Juvenile Interrogations: Applying the Close Relationship Standard of Emotional Distress*, 68 U. Chi. L. Rev. 903, 914 (2001).

¶ 157    In Richardson's case one could argue that his mother was not sufficiently interested, was not able to fully understand the gravity of the situation (since no one told either Richardson or his mother that the charge would be murder) and possibly had a conflict of interest since she was the victim's grandmother.

¶ 158                              Rule 402 Conference

¶ 159    Defense Counsel asked for a Rule 402 (Ill. S. Ct. R. 402 (eff. July 1, 2012)) conference and the judge gave Richardson his Rule 402 admonishments:

> "THE COURT: Mr. Richardson, your attorney has asked for a 402 conference. That means I am going to sit down with your lawyer and the lawyer from the state's attorney's office, go over your background, as well as the facts of this case. Do you understand?
>
> RICHARDSON: Yes.
>
> THE COURT: If you don't like the results of the conference I am still going to be the judge that hears your bench trial, should you have a bench trial, do you understand?
>
> RICHARDSON: No.
>
> THE COURT: Knowing that, do you still want me to have the conference.
>
> RICHARDSON: Yes."

¶ 160    Once Richardson said "No" the trial judge had a duty to explain in understandable terms that she would still be the judge who heard the whole trial. She did not.

¶ 161    Defense counsel did not object or raise this as an issue in the motion for a mistrial or motion for a new trial. Appellate counsel did not raise this as an issue of substance related to the judge's behavior or as an issue of ineffective assistance of defense counsel.

¶ 162                    Office of Professional Standards Report

¶ 163    The OPS report on Richardson's injuries was presented to the court and to the defense and State, and the State suggested that some stipulations might be entered regarding the report, but defense counsel did not introduce the report into evidence in the motion to suppress, nor did any stipulations result from that report. The court did review the OPS report *in camera*, but since it was not introduced as evidence and it is not part of the record we have no idea what, if any, impact the information in that report could have had on this trial.

¶ 164    The State of Illinois has taken some steps to solve part of this problem. By passing section 103-2.1(f) of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-2.1(f) (West 2010)), Illinois has required that all custodial interviews in murder cases must be recorded. This of course does not help Richardson since he was arrested for child abuse, upgraded to murder, in 2001, but this change is clearly going to make custodial interviews in murder cases transparent. "The only fair reading of the statute is that the legislature's clear intent was to ensure that statements related to murder investigations were not the result of coercive pressures of custodial interrogation in a police facility but, rather, were both voluntary and reliable." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 51, *quoted in People v. Dominique Clayton*, 2014 IL App (1st) 130743, ¶ 51.

¶ 165    Perhaps we will see the day when all juvenile interrogations will be made with an appointed attorney and be recorded as well. That would prevent any question of abuse, coercion or voluntariness of juvenile confessions. As Justice McMorrow said in her dissent in

- 26 -

*G.O.*: "Individuals of greater age and experience could find these same circumstances overwhelming and coercive. To a boy of G.O.'s youth and presumed naiveté, these circumstances could be sufficiently overpowering as to raise a genuine doubt whether any confession made in this atmosphere would be the product of a free will." *In re G.O.*, 191 Ill. 2d 37, 67 (2000) (McMorrow, J., dissenting).

¶ 166                                    Involuntary Manslaughter Instruction

¶ 167    Both the appellate and supreme courts focused on the motion to suppress because that is the only argument his appellate attorney made regarding his mental capacity.

¶ 168    But the missing evidence was particularly important information for the court to have when, for example, it was ruling on the defense requested instruction on involuntary manslaughter. Defense counsel argued that Richardson admitted the acts he took against his daughter, but that if he testified he did not know he was doing great bodily harm, and that it was up to the jury to "decide if he intentionally caused her death or great bodily harm or whether the death was caused unintentionally by acts which were performed recklessly *** the medical examiner testified to a significant number of injuries. Those were the result of his actions *** not the intent of his actions and the intent of his actions needs to be decided by the jury."

¶ 169    The trial court responded: "The Court is aware of the current case law which is meant to include lesser-included instructions when there is any *evidence* at all to support those lesser-included instructions. In this case the court finds that there is *no evidence* whatsoever for the jury to consider regarding recklessness ***. There is *no evidence* to support recklessness ***."(Emphases added.)

¶ 170    *No evidence*. No psychological evaluation, no testimony from Richardson about his mental health, no testimony from his mother, teachers, principal, friends. *No evidence*.

¶ 171    Once again the missing evaluation, expert testimony or occurrence testimony from family, teachers, principals and friends had a disastrous effect on Richardson's case. Defense counsel gave the judge nothing on which she could have remotely considered the requested involuntary instruction, a point which was highlighted in *Richardson III*, when the appellate court once again pointed to the fact that there was "no evidence" of recklessness to support the involuntary instruction. There was *no evidence* because counsel did not provide any. Counsel had a duty to provide the best possible defense, and this omission is not only ineffective assistance of trial counsel but is also ineffective assistance of appellate counsel who did not raise the missing evidence in relation to the element of intent for murder or the denied involuntary instruction.

¶ 172    "[A]n instruction is justified on a lesser offense where there is *some evidence* to support the giving of the instruction. *People v. Jones*, 175 Ill. 2d 126, 132 (1997). If there is some *credible evidence* in the record that would reduce the crime of first degree murder to involuntary manslaughter, an instruction should be given. *People v. Foster*, 119 Ill. 2d 69, 87 (1987); *People v. Ward*, 101 Ill. 2d 443, 451 (1984). Where *some evidence* supports the instruction, the circuit court's failure to give the instruction constitutes an abuse of discretion. *Jones*, 175 Ill. 2d at 132. The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death. *Foster*, 119 Ill. 2d at 87. Involuntary manslaughter requires a less culpable mental state than first degree murder. *** [A] defendant commits involuntary manslaughter when he performs acts that are

likely to cause death or great bodily harm to another and he performs these acts recklessly. 720 ILCS 5/9-3(a) (West 1994)." (Emphases added.) *People v. DiVincenzo*, 183 Ill. 2d 239, 249-50 (1998). In *DiVincenzo* the supreme court found that the involuntary manslaughter instruction should have been given in part because "[s]ome of this evidence could have suggested to the jury that defendant acted recklessly but *without knowledge* of a strong probability of death or great bodily harm. *** Determination of defendant's mental state may be inferred from the circumstantial evidence [citation], and this task is particularly suited to the jury." (Emphasis added.) *DiVincenzo*, 183 Ill. 2d at 251-52.

¶ 173    The instruction on involuntary manslaughter was critical to Richardson's defense case, yet the defense counsel did not do the single most important thing she could have to get that instruction before the jury: she did not provide any evidence to give context to his action. She was ineffective in the extreme.

¶ 174                                          Intent

¶ 175    The defense in closing argued that the defense was not contesting the significant number of injuries to Diamond, was not contesting the fact of the injuries, was not contesting the result, but was contesting the intent of his actions. Defense counsel, absent any evidence of Richardson's mental capacity when he was 16, relied, instead, on the fact that he was a teenager, left to fend for himself in the home of his mother's boyfriend's sister, to take care of her three children. Defense counsel argued, with no evidence having been presented, that minors do not have the mental or emotional capacity to be treated like an adult.

¶ 176    Defense counsel made a motion for mistrial based on the denial of the instruction on involuntary manslaughter.

¶ 177    The trial court denied the motion saying: "[T]he Court is well aware that if there is any, and I will emphasize any *credible evidence* to support a reckless act I would have given the involuntary instruction. *** [T]here *is no evidence* of recklessness. *** *There is not one scintilla of evidence* that the Defendant did anything but beat this child over a period of time ***. Your motion for a mistrial is denied. And again I would feel more comfortable giving them a possession of a stolen motor vehicle instruction because there's equal amount of evidence to support that as there is reckless conduct here." (Emphases added.)

¶ 178    The appellate court stated: "There is *not a scintilla of evidence* to support a finding that defendant acted recklessly rather than knowingly and intentionally." (Emphasis added.) *Richardson III*, 401 Ill. App. 3d at 51.

¶ 179    The supreme court found: "[A]t the suppression hearing, defendant presented *no evidence* or argument of any mental deficiency that would render his inculpatory statement involuntary, and the circuit court made no findings related thereto." (Emphasis added.) *People v. Richardson*, 234 Ill. 2d 233, 263 (2009).

¶ 180    *No evidence. No evidence. No evidence.* The counsel for defense presented *no evidence* of recklessness. How much more clear must it be that counsel for defense was ineffective?

¶ 181                                     Jury Question

¶ 182    Yet, even with no evidence her argument must have meant something to the jurors, because they sent out a note asking: "Does the Jury have an option of finding him guilty of a lesser charge? What would be the minimum punishment?"

¶ 183     The trial court answered: "You have the law that applies to this case. You are not to consider possible punishment in the case. It is the function of the trial court to sentence the defendant should you return a verdict of guilty. Please continue your deliberation."

¶ 184     Without an instruction on involuntary manslaughter, the jury was faced with no option. The defendant admitted inflicting the injuries to Diamond. He said he did not intend to murder her. Defense counsel presented no evidence to establish his lack of intent. The jury found him guilty of murder.

¶ 185     In *Patterson*, 2014 IL 115102, the supreme court held that the defendant had not shown ineffective assistance of counsel where his defense attorney did not present sufficient evidence of his mental functioning in relation to the voluntariness of his confession. The court found that even without the confession the overwhelming evidence supported his conviction. "Given the overwhelming evidence corroborating the victim's testimony and weighing against the defendant's account, we are not persuaded that it is reasonably probable that a jury would have acquitted defendant even in the absence of any reference to his confession at trial. The reasonably probable impact of counsel's alleged error is not sufficient to undermine our confidence in the outcome of the trial. Therefore, defendant has failed to establish the prejudice prong of the *Strickland* test ***." *Patterson*, 2014 IL 115102, ¶ 87.

¶ 186     In Richardson's case every judge who has heard evidence or looked at the case has said that the missing evidence would have been important to their decision. The jury asked about a lesser-included offense. There is more than sufficient reason to believe that the defense failure to provide evidence on this matter did undermine confidence in this trial.

¶ 187                           Ineffective Assistance of Defense Counsel

¶ 188     To say that Richardson received ineffective assistance of trial counsel and ineffective assistance of appellate counsel is a serious undercount of the things that went wrong in this case.

¶ 189     In the motion to suppress, defense counsel did not specify what, if any, City of Chicago police department rules, regulations or procedures were involved in the arrest, lock-up process, detention, custody or questioning of Richardson, who, for the first nine hours after his arrest was not being held as a juvenile charged as an adult, but was in fact being held as a juvenile arrested for child abuse.

¶ 190                                    Juvenile in Custody

¶ 191     Defense counsel did not question anyone about the time Richardson's mother was at the police station but did not speak alone with her son *before* he was questioned.

¶ 192     Defense counsel did not question anyone about the fact that between his arrest at 3:30 p.m. and the time the victim died and the charge of murder was added to the arrest report, Richardson was technically and in reality a juvenile himself arrested for child abuse and was entitled to whatever procedures, rules and regulations were in place in the Chicago police department in February 2001 for the arrest and detention of a juvenile.

¶ 193     Defense counsel did not question anyone about what those procedures, rules and regulations actually were in February 2001.

¶ 194                                            Lockup Keeper

¶ 195      Defense counsel did not question the lockup keeper, Davis, star No. 302689, about what happened to Richardson in the lockup that resulted in his swollen eye.

¶ 196      Defense counsel did not question the lockup keeper, Davis, to determine why he signed the lockup report and his "visual check" of Richardson at 4 p.m. and that question No. 1: "[D]oes arrestee have obvious pain or injury?" Davis answered "no." It is uncontroverted that the injury to Richardson's eye occurred in the lockup. The timing of the lockup report ("Moving of Arrestee Out of & Into Arrest/Detention Facility") at 4 p.m. raises several other questions, the very least of which is why, if Richardson was injured in the lockup, the visual report does not indicate the injury, or why Richardson, who was still just an arrested juvenile at 4 p.m., and not a juvenile being charged as an adult, was not given medical attention and was not made available to the OPS investigators who were called in after his injury.

¶ 197      Defense counsel took it as gospel that the investigation into the injuries to Diamond took precedence to the OPS investigation into Richardson's injuries at the hands of police personnel and did not call on anyone from OPS or in management of the police department to verify that, in fact, it was department policy that made it impossible for OPS to talk to Richardson while he was waiting, from 4 p.m. until the detectives started questioning him about the injuries to Diamond at 9:08 p.m. and was still only a juvenile under arrest for child abuse.

¶ 198                                            *Miranda* Warnings

¶ 199      Defense counsel did not question anyone about the fact that Richardson, still a juvenile under arrest for child abuse, was questioned at 9:08 p.m. and was, according to police testimony given his *Miranda* rights by youth officer Nolan; however no signed waiver of those rights, by either or both Richardson and/or his mother is in the record.

¶ 200      Defense counsel did not question anyone about the fact that Richardson did not have an opportunity to talk to his mother alone before the 9:08 p.m. questioning.

¶ 201      Defense counsel did not question anyone about the fact that although ASA Heil testified that he gave Richardson his *Miranda* rights at 10 p.m. there is no signed waiver of those rights in the record.

¶ 202      Defense counsel did not question anyone about the fact that although ASA Heil testified that he gave Richardson his *Miranda* rights again at 12:28 a.m. on February 10, 2001, there is no signed waiver of those rights in the record.

¶ 203      Defense counsel did not question anyone about the fact that while ASA Heil did tell Richardson that he could be tried as an adult, after Diamond died neither Heil nor anyone else told the defendant that he would be charged with murder, leaving the defendant to mistakenly believe that he was still being charged with child abuse. A review of the arrest report makes it clear that the charge of murder was added at a different time than the original arrest, which makes sense since the child did not die until much after Richardson was arrested at 3:30 p.m. on February 9, 2001.

¶ 204      Defense counsel did not question anyone about the fact that the youth officer was wearing two hats: he was, according to his own testimony, investigating the abuse and subsequent death of Diamond and also appeared to be acting as the youth officer to protect the rights of Richardson, an apparent and disturbing conflict of interest.

¶ 205    Defense counsel did not question Richardson or Richardson's mother about her own physical and mental ability at the time he was being questioned, although Richardson clearly knew and could have told Defense counsel that his mother was a cocaine addict and drank a fifth of whiskey a day, which should have raised serious concerns about her own competence as an interested adult during his questioning.

¶ 206    Defense counsel did not question Richardson or Richardson's mother about her sympathy for the child victim, Diamond. She was, after all, the child's grandmother, and as such may have had a conflict of interest between her grandchild and her own son, the son she had pushed out to fend for himself at the apartment of her boyfriend's sister.

¶ 207    Defense counsel did not question Richardson's mother about his mental ability, his school progress, or his special education or the five different schools he attended.

¶ 208    Defense counsel did not question Richardson's mother about what discipline she used on Richardson, or her alcohol or drug use during her pregnancy and his childhood.

¶ 209    Defense counsel did not question any of Richardson's teachers, counselors, school principals about his mental ability, his school progress, or his special education.

¶ 210    Defense counsel did not question any family or friends about his mental ability, his school progress, or his special education.

¶ 211    Defense counsel did not question Richardson himself about his mental ability, his school progress or his special education or his mother's discipline techniques.

¶ 212    Defense counsel did not, after four full years to prepare for trial, provide any medical or psychological evaluation of Richardson. This fact has been dealt with by the appellate court and by the supreme court, but only in the context of the motion to suppress.

¶ 213    Defense counsel's failure to provide any evidence of Richardson's mental ability, his school progress or his special education had a fundamental and drastic negative impact, not only on the motion to suppress, but later when confronting the State on the issue of his intent to commit murder, and as has been shown above in the instruction for involuntary manslaughter issues.

¶ 214                    Ineffective Assistance of Appellate Counsel

¶ 215    Appellate counsel failed to raise the issue of the defense counsel's failure to provide evidence of Richardson's mental ability, his school progress or his special education as regards the issue of intent to commit murder, an element of the offense and something that the State was required to prove beyond a reasonable doubt. This missing evidence was critical when the trial court said, in reference to the defense request for an instruction on involuntary manslaughter: "there is not a scintilla of evidence [to support the instruction]."

¶ 216    This missing evidence was critical in the appellate court. And, this missing evidence was critical in the supreme court.

¶ 217                                    *Res Judicata*

¶ 218    The missing evidence created a gaping three-dimensional hole in the defense case which was never repaired. The defense did not provide the evidence at the motion to suppress; it did not provide the evidence *anywhere* as part of the defense. The appellate counsel did not raise the issue of the missing evidence as part of the overall defense or on the issue of the denied instruction or the State's burden to prove intent beyond a reasonable doubt. So while the

- 31 -

missing evaluation would be *res judicata* for defense counsel in terms of the motion to suppress because it was raised on direct appeal, and for appellate counsel because it was raised on appeal and in terms of intent because it could have been raised on appeal, it cannot be *res judicata* for a postconviction petition in terms of ineffective assistance of *appellate counsel.* The issue of the missing evaluation is still very much alive for the purpose of a postconviction petition, a point my colleagues have missed.

¶ 219    In this appeal, the court's dismissal of the first stage *pro se* postconviction petition as frivolous and without merit was based on the fact that Richardson argued again the failure of his defense counsel to provide the evidence to support the motion to suppress. Richardson, acting *pro se*, could never be expected to articulate the impact of the failures in the overall defense case, the denied instruction or any other failure of the defense or appellate counsel.

¶ 220    The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, nor could they have been, adjudicated previously upon direct appeal. *People v. Peeples*, 205 Ill. 2d 480, 510-11 (2002) (citing *People v. Haynes*, 192 Ill. 2d 437, 464 (2000)). Because a proceeding brought under the Act is a collateral attack on defendant's conviction and/or sentence, the doctrine of *res judicata* bars consideration of issues that were raised and decided on direct appeal. *Peeples*, 205 Ill. 2d at 510 (citing *People v. Towns*, 182 Ill. 2d 491, 502 (1998)). Further issues that could have been presented on direct appeal but were not are waived for purposes of postconviction review. *Peeples*, 205 Ill. 2d at 510; *Haynes*, 192 Ill. 2d at 465; *Towns*, 182 Ill. 2d at 503.

¶ 221    However, the doctrines of *res judicata* and waiver will be relaxed in three situations: where fundamental fairness so requires; where the alleged waiver is attributable to the incompetence of appellate counsel; or where the facts relating to the postconviction claim do not appear on the face of the original record. *Peeples*, 205 Ill. 2d at 510-11 (citing *People v. Mahaffey*, 194 Ill. 2d 154, 171 (2000)).

¶ 222    An evidentiary hearing is warranted on a postconviction claim only where the allegations in the postconviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that the constitutional rights of the defendant have been violated. *Peeples*, 205 Ill. 2d at 510-11; *Haynes*, 192 Ill. 2d at 465.

¶ 223    The doctrines of *res judicata* and forfeiture are relaxed in a proceeding on a petition for postconviction relief where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the fact of the original appellate record. *People v. English*, 2013 IL 112890, ¶ 22 (citing *People v. Williams*, 209 Ill. 2d 227, 233 (2004)).

¶ 224    "[W]hen a petitioner's claims are based upon matters outside the record, this court has emphasized that 'it is not the intent of the [A]ct that [such] claims be adjudicated on the pleadings.' *People v. Airmers*, 34 Ill. 2d 222, 226 (1966). See also *People v. Clements*, 38 Ill. 2d 213, 216 (1967) (same). Rather, the function of the pleadings in a proceeding under the Act 'is to determine whether the petitioner is entitled to a hearing.' *Airmers*, 34 Ill. 2d at 226. Therefore, the dismissal of a post-conviction petition is warranted only when the petition's allegations of fact – liberally construed in favor of the petition and in light of the original trial record–fail to make a substantial showing of imprisonment in violation of the state or federal constitution." *People v. Coleman*, 183 Ill. 2d 366, 382 (1998). "After reviewing the entire transcript of the original trial, we are unable to conclude that there exists no reasonable

likelihood that [the missing evidence] would not have affected the jury's deliberative process and judgment." *Coleman*, 183 Ill. 2d at 396.

¶ 225　　"A ruling on an initial postconviction petition has *res judicata* effect with respect to all claims that were raised or could have been raised in the petition. [Citation.] Section 122-3 of the Act provides that any claim of a substantial denial of a constitutional right not raised in a defendant's original postconviction petition is waived. [Citation.] 'There is less interest in providing a forum for the vindication of a defendant's constitutional rights in a successive proceeding because the defendant has already been afforded an opportunity to raise such allegations in his first petition.' " *People v. Thompson*, 383 Ill. App. 3d 924, 931 (2008) (quoting *McDonald*, 364 Ill. App. 3d at 393).

¶ 226　　In fact, in *People v. Wilson*, this court held: "Accordingly, an exception to barring a claim based on *res judicata* in a first-stage postconviction proceeding applies 'where [the] facts relating to the claim do not appear on the face of the original appellate record.' " *Wilson*, 2013 IL App (1st) 112303, ¶ 16 (quoting *People v. Blair*, 215 Ill. 2d 427, 450-51 (2005), and citing *People v. Harris*, 206 Ill. 2d 1, 13 (2002), and quoting *People v. Mahaffey*, 194 Ill. 2d 154, 171 (2000)).

¶ 227　　Since our colleagues on the appellate court in *Richardson III* have already found that the matter of the missing evidence is outside the record, it would seem that the majority is being inconsistent in this regard.

¶ 228　　This case is similar to *People v. Tate*, 2012 IL 112214, in which the defendant's postconviction petition alleged his defense counsel was ineffective for failing to call four witnesses–two alibi and two occurrence witnesses. The State argued that his claims were forfeited because he did not include them in his posttrial motion. The court held that "Tate's ineffective-assistance claims thus are based on what trial counsel should have done, not on what counsel did. An ineffective assistance claim based on what the record discloses counsel did, in fact, do is subject to the usual procedural default rule. *People v. Erickson*, 161 Ill. 2d 82, 88 (1994). 'But a claim based on what ought to have been done may depend on proof of matters which could not have been included in the record precisely because of the allegedly deficient representation.' *Id*. Thus, this court has 'repeatedly noted that a default may not preclude an ineffective-assistance claim for what trial counsel allegedly ought to have done in presenting a defense.' *People v. West*, 187 Ill. 2d 418, 427 (1999)." *Tate*, 2012 IL 112214, ¶ 14. Here we consider what Richardson's trial counsel ought to have done, and not default, forfeiture or *res judicata* can apply where Richardson could not have argued that at trial or in his motion for a new trial. Nor could his appellate counsel have argued it because it was outside the record.

¶ 229　　Justice Murphy had the same view in *People v. Godard*, 2012 IL App (1st) 103355-U, and his logic is persuasive. He held that the circuit court erred when it dismissed defendant's *pro se* postconviction petition at the first stage of proceedings on the basis of waiver and *res judicata* where defendant's claims are based on facts that were not part of the record on direct appeal. There the defendant alleged ineffective assistance of counsel for failing to file a motion to suppress a confession. The circuit court dismissed the claim on the basis of *res judicata* and waiver. Justice Murphy held: "an exception to this rule [*res judicata* and waiver require summary dismissal] exists where 'facts relating to the claim do not appear on the face of the original appellate record' because although some claims may potentially be presented on appeal, the reviewing court may be incapable of considering those claims under the rules

governing appellate review. *Id.* at 372. Thus, where a claim's evidentiary basis is *de hors* the record, waiver and *res judicata* do not apply, irrespective of whether the claims could have been raised by a party on direct appeal and regardless of 'whether their supporting facts are available as a practical matter at the time of the direct appeal.' [*Coleman*, 183 Ill. 2d at 372]." *Id.* ¶ 11. Justice Murphy went on to say that while failure to file a motion to suppress may be seen as a matter of trial strategy, where such a motion is the defendant's strongest or only viable defense, counsel's failure to file the motion "may constitute ineffective assistance [of counsel]" "because it would have deprived the State of its primary and strongest piece of evidence and the failure to bring such a motion cannot be considered sound or valid trial strategy." *Godard*, 2012 IL App (1st) 103355-U, ¶ 18. Richardson is saying if his defense counsel had presented evidence of his mental ability it would have brought into question the voluntariness of his confession and rebutted the state's case of intentional murder. He claims that this failure by his defense counsel could not possibly have been sound trial strategy, since, after the trial, his evaluation presented compelling information about his mental ability four years after his arrest, and logically he could not have been more mentally able at the age of 16 than at the age of 20 making it at least arguable that his defense counsel was ineffective and that it is reasonably probable that the result of his jury trial would have been different. His petition is not frivolous or without merit because it has an arguable basis in both law and fact.

¶ 230                                    Judge's Behavior

¶ 231     Neither the defense counsel nor appellate counsel claimed the judge was so extremely sarcastic that it had a chilling effect on the defense attorney, and her sarcasm could be interpreted as bias against this defendant as can be shown in her response to defense counsel's motion to suppress:

> "DEFENSE COUNSEL: May I argue?
>
> THE COURT: *You can certainly argue, if you could do it with a straight face. I'd appreciate it if you didn't laugh during your argument. Go on. And I will try not to laugh during my findings.*" (Emphasis added.)

¶ 232     These remarks were made in open court in the presence of the defendant. We do not know how the defense attorney or her client reacted to the remarks of the judge at this point in the case, but remarks like this could hardly have been a signal that the judge had no opinion.

¶ 233     And again the trial judge was sarcastic in the jury instructions as seen above in her remark about stolen motor vehicle instructions.

¶ 234     "Illinois courts have long upheld the right of an accused to a fair and impartial trial by jury, 'free from influence or intimation by the trial court.' " *People v. Mitchell*, 228 Ill. App. 3d 167, 169 (1992) (quoting *People v. Sprinkle*, 27 Ill. 2d 398, 402 (1963), and citing *People v. Santucci*, 24 Ill. 2d 93 (1962)). In *Mitchell* the judge mocked the defense counsel in front of the jury stating: " 'Well, you can ask questions like that until midnight, they didn't go to the garage, they didn't go to the park, they didn't go to the moon, they just went to the station and that's it.' " *Mitchell*, 228 Ill. App. 3d at 170. The appellate court found that the "mockery of the defense greatly undermined counsel's theory *** and could not help but communicate to the jury what the judge was thinking. The judge's attack on defense counsel" "coupled with the judge's hostile attitude, *** denied Mitchell the fair trial to which he is entitled." *Mitchell*, 228 Ill. App. 3d at 170-71. In Richardson the judge was most hostile to the defense out of the presence of the jury, but the chilling effect was just as unacceptable.

- 34 -

¶ 235    In Richardson's motion to suppress hearing, outside the presence of the jury, the court was clearly sarcastic and showed a very certain mind-set of the judge that the defendant's confession was voluntary. In *People v. Ojeda*, 110 Ill. App. 2d 480, 485 (1969), faced with a judge's remarks about the veracity of a witness, the appellate court held: "Of more concern, however, is the possibility that the improper comments, coming when they did, reflected a preconceived attitude on the part of the trial judge regarding the defendant's guilt. Since it is fundamental that a Magistrate resolve disputed questions of fact only after hearing all of the evidence with an open mind, we must reverse and remand this cause for a new trial." In *Ojeda* the court's comments came during the actual trial, unlike here, where the court's comments came directly after the defense presented its testimony in the motion to suppress. But the comments themselves demonstrate not only the court's own mind-set, they also demonstrate how glaring the failure of the defense to call any witnesses or present any evidence as to Richardson's mental ability was, not only for the motion to suppress, but later, in the trial toward the issue of intent, and finally, in dealing with the question of the involuntary instruction. This judge believed Richardson was guilty of murder and no evidence to provide insight into involuntariness of the confession or recklessness in his actions toward Diamond was provided. At the motion to suppress the judge was rude and sarcastic beyond any acceptable range, and even though she was correct that there was no evidence presented, her choice of words and manner had a continued effect on defense throughout this trial.

¶ 236    And, we cannot overlook the fact that this judge even before the trial announced to the entire group of prospective jurors that while the case was important it would not take up much of their time. It can be argued that the judge was telling the jury that the whole trial was merely a *pro forma* exercise, which may have been interpreted by some or all of the jurors to believe that the judge thought the defendant was guilty and they should be able to come to that conclusion quickly. This hypothesis is bolstered by the judge's answer to the note sent out by the jurors after they began their deliberations.

¶ 237    Their note said: "Does the jury have an option of finding him guilty of a lesser charge but what would the minimum punishment be?" The court wrote back: "You have the law that applies to this case. You are not to consider possible punishment in this case. It is the function of the trial court to sentence the defendant should you return a verdict of guilty. Please continue your deliberations." Defense counsel argued during the discussion of that response that it sounded like the judge was telling the jury that the defendant was guilty. The judge disagreed. However, by repeating the word "guilty," instead of stopping at "you are not to consider possible punishment in this case," the judge reinforced the very thing that the jury was asking about: we think he's guilty of something, but we're not quite sure it's murder. And, because the judge refused to give the involuntary instruction, again, because defense counsel did not put on any evidence to support it, the jury had nowhere else to go. The combination of the judge's mind-set and the defense counsel's failure produced the perfect storm with Richardson right in the middle.

¶ 238    In *People v. Johnson*, 2012 IL App (1st) 091730, the appellate court considered the failure of the trial court to comply with *Zehr* and Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). Using a plain error analysis the court found that the evidence was closely balanced, that the trial court erred, and reversed and remanded. In the same case the appellate court was also asked to consider whether the judge's claimed hostility toward defense counsel was reversible error. The judge in the presence of the jury made disparaging remarks about defense counsel.

The appellate court reversed and remanded on other grounds but took pains to point out that the judge's comments toward defense counsel outside the presence of the jury "were not 'reasonably required for the underlying progress of the trial.' " (Internal quotation marks omitted.) *Johnson*, 2012 IL App (1st) 091730, ¶ 81 (quoting *People v. Eckert*, 194 Ill. App. 3d 667, 674 (1990)). The appellate court noted that "the need for judicial restraint in the court's conduct and remarks *is not limited to the presence of the jury but must be maintained throughout all of its dealings with the litigants who come before it.*" (Emphasis added.) *Johnson*, 2012 IL App (1st) 091730, ¶ 80.

¶ 239    In Richardson, the court itself called attention to the fact that defense counsel did not present any evidence of Richardson's mental competence, and Richardson admitted inflicting the injuries on his daughter, so it can hardly be said within what actually happened that this was a close case. However, if defense counsel had presented evidence of his limited mental ability and evidence of his own childhood, it could be argued that on the issue of intent, and on the issue of recklessness, it might have been close–close enough for the jury to have had the benefit of the information and the alternate instruction.

¶ 240    The judge's sarcasm created a specific problem for defense counsel. "The making of an objection to questions or comments by a judge poses a practical problem for the trial lawyer. It can prove embarrassing to the lawyer, but, more importantly, assuming that most juries view most judges with some degree of respect, and accord to them a knowledge of law somewhat superior to that of the attorneys practicing before the judge, the lawyer who objects to a comment or question by the judge may find himself viewed with considerable suspicion and skepticism by the very group whom he is trying to convert to his client's view of the facts, thereby perhaps irreparably damaging his client's interests. If he fails to object, he may, on appeal, be faced, as defendant here is, with the claim that his failure to act has precluded consideration of the error, and it is not always a sufficient answer to this situation to say that the objection can be made and ruling secured outside the hearing of the jury." (Internal quotation marks omitted.) *People v. Mays*, 188 Ill. App. 3d 974, 983 (1989).

¶ 241    If this is true where the judge's comments are made in front of a jury, it is no less true when the judge's sarcasm is directed to defense counsel before the trial has even begun. No public defender, assigned to a specific courtroom in Cook County, could be expected to complain to the judge directly about the judge's own bias or sarcasm without being afraid of effectively burning all bridges with the judge. It is inconceivable that any defense attorney would take the risk, let alone a public defender who has, by the nature of the job, to show up in front of that judge on a daily basis.

¶ 242                          No Signed *Miranda* Waivers

¶ 243    Neither the defense attorney nor the appellate attorney raised the issue of the failure of the police or the assistant State's Attorney to get a signed *Miranda* waiver at any of the questionings before the video statement.

¶ 244    Neither the defense attorney nor the appellate attorney raised the issue that the video consent form that was signed is not a substitute for a signed *Miranda* waiver.

¶ 245    Neither the defense attorney nor the appellate attorney raised the issue that although the video confession does acknowledge *Miranda* warnings, and an agreement to proceed by the 16-year-old and his mother was in the room, the mother did not affirmatively agree to proceed

with the video warnings, the same mother who testified that the police had been abusive to her.

¶ 246                           No Notice of the Actual Charge of Murder

¶ 247     Neither the defense attorney nor the appellate attorney raised the issue that nowhere in the video confession did the assistant State's Attorney or the police tell Richardson that he would be charged with murder.

¶ 248     Neither the defense attorney nor the appellate attorney raised the issue of Detective O'Connell's failure to tell Richardson what he was being charged with when, as O'Connell testified, he told Richardson that he could be charged as an adult but did not say the charge would be murder.

¶ 249     Neither the defense attorney nor the appellate attorney challenged the court's statement that the defendant "implicated himself in murder"–the defendant was told he was being charged with child abuse. He was told later that his child died. No one ever mentioned the word "murder." His entire reaction might have been significantly different if a murder charge was made known to him.

¶ 250     Neither the defense attorney nor the appellate attorney challenged the court's statement that Richardson was "advised" he was facing a murder charge, when nothing in the record supports that statement.

¶ 251                                   Richardson's Injury

¶ 252     Neither the defense attorney nor the appellate attorney raised the issue of a possible concussion leading to confusion or fatigue in reference to his two unrecorded sessions of questioning by the police and later with the assistant State's Attorney, and his one videotaped statement, although the defendant repeatedly stated he had been hit in the lockup, fell and hit his head, which may have indirectly resulted in his decision to be questioned before talking to an attorney or to the fact that no one sought medical attention for the juvenile in custody.

¶ 253     Neither the defense attorney nor the appellate attorney raised the issue that Richardson was already injured and had hit his head when Detective O'Connell questioned him the first time, and that questioning was done without a signed *Miranda* waiver.

¶ 254                                 Richardson's Illiteracy

¶ 255     Neither the defense attorney nor the appellate attorney raised the issue of Richardson's illiteracy at the time he was arrested and questioned and the impact that may have had on his ability to knowingly agree to be questioned without an attorney the first time Detective O'Connell questioned him or the second time he was questioned or in the video statement. Nor did anyone ask if the first police officer on the scene, Officer Hayes, who clearly got some information from Richardson, and who was with him from about 3:30 to about 9:08 p.m. that evening ever gave him *Miranda* warnings.

¶ 256            OPS Not Allowed to Speak to Richardson Before He Was Questioned

¶ 257     Neither the defense attorney nor the appellate attorney challenged the procedure, or even verified it was the procedure at the time, that an OPS investigation of injury to a juvenile not charged as an adult had to wait until after the juvenile is questioned.

¶ 258                    Mother Not Allowed to Speak to Richardson Before Questioning

¶ 259        Neither the defense attorney nor the appellate attorney challenged the fact that Richardson's mother was not allowed to speak to her juvenile son alone before the questioning began.


¶ 260                    Failure of Youth Officer to Protect Richardson From Injury

¶ 261        Neither the defense attorney nor the appellate attorney raised the fact that youth officer Nolan left Richardson, a juvenile charged with child abuse, alone at the police station where he was injured by police personnel. Richardson admitted that none of the police personnel who questioned him had injured him and that he was injured in a different place than he was questioned. However, he was arrested and taken to the Second District where he was injured in the lockup, and then moved upstairs in the same building to the rooms used for questioning by Area 2 Detectives. Officer Hayes took him to the building and moved him from the Second District on the first floor, to the lockup downstairs and then later to Area 2 upstairs. The same building had the staff who injured him and the staff who questioned him. To an immature 16-year-old it is more likely than not that the whole building seemed to be the same thing: police department facilities, staffed by police department personnel. Do we really believe that Richardson when he was being questioned knew and understood the different layers of police staffing, or that he was safe from further abuse?


¶ 262                    Questioning Without a Youth Officer or Interested Adult

¶ 263        Neither the defense attorney nor the appellate attorney challenged the court's assertion that Richardson was never questioned outside the presence of the youth officer, since he was arrested and with police from 3:30 to 9:08 p.m. before youth officer Nolan saw him for the questioning. He was with Officer Hayes at the time of his arrest. He clearly made some sort of statements and was clearly asked some questions by someone: his arrest did not occur in silence. He was in the lockup without a youth officer for some period of time, then he was back again with Officer Hayes until 9:08 when the questioning by Detective O'Connell began. Officer Hayes did talk with Richardson at the time of his arrest and it is clear that Officer Hayes did ask Richardson what happened. That would be questioning without the presence of a youth officer.


¶ 264                    Richardson's "Appearance" in the Video Statement

¶ 265        Neither the defense attorney nor appellate attorney challenged the trial court's assessment that in the video statement Richardson "appears to be calm, cool, collected" and not agitated, when it was just as likely that he was exhausted after being in custody from 3:30 p.m. February 9, to the time of the statement, about 9:27 a.m. on February 10, 2001, that he was a juvenile in intimidating surroundings, and he was never asked at the trial to testify about his condition or his physical or emotional state by the time of the video, which left the judge and the jury with only their observation without explanation. It is also possible that by the time the video was made the defendant felt that the statement he was giving was rehearsed. Further, no one seriously challenged Assistant State's Attorney Heil when he said he did not take notes of his questioning of the defendant before the video, yet Heil had a sequence of events lined up so neatly that his leading questions just marched along so that all the defendant had to do was agree with Heil on the details.

¶ 266    Neither the defense attorney nor the appellate attorney challenged the trial court's statement that its decision was based in part on the fact that the mother said the police only got upset when she said she wanted to go home, when in fact it was the mother's testimony that the police got upset with her, called her names and yelled at her when she told her son that he did not have to speak to them.

¶ 267    Neither the defense attorney nor the appellate counsel challenged the trial court's statement that the mother indicated full cooperation not coercion, when in fact the mother testified that she and the defendant were both scared of the police.

¶ 268    The defense attorney did not object, and the appellate counsel did not raise as an issue the failure to object, to the state's motion *in limine* regarding the lack of any evidence of any prior child abuse to Diamond at the hands of the defendant, which effectively cut off defendant's ability to provide evidence that his history with Diamond was free from any injury to the child.

¶ 269    Neither the defense attorney nor the appellate attorney challenged the trial court's statement to the jury that while this is a murder case it "is not going to take much of your time," signaling indirectly to the jury that it was a cut and dried matter that should be an easy case, arguably giving the jury the impression that the court thought the defendant was guilty.

Problem With *Zehr* Principles

¶ 271    Neither the defense attorney nor the appellate attorney raised the issue of missing *Zehr* questioning of the jury panel.

¶ 272    At the time of the trial Rule 234 still required the defense attorney to ask for the *Zehr* principles during the questioning of the potential jury members.

¶ 273    Defense counsel did not request the *Zehr* questions.

¶ 274    "We are of the opinion that essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him." *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 275    In Richardson's trial, on February 9, 2005, the trial court told all of the assembled prospective jurors that the case is "important, however, it is not going to be taking up much of your time."

¶ 276    After the first group of 12 potential jurors was seated in the jury box, the trial court advised them that the State must prove the defendant guilty beyond a reasonable doubt, and asked if anyone had "any problems with this proposition." None did.

¶ 277    Defense counsel later questioned the same group of 12, asking if anyone had any problems with the proposition that it cannot be held against the defendant if he does not testify on his own behalf. None did.

¶ 278    That means that neither the entire group of potential jurors nor the specific 12 in the first group in the jury box, 6 of whom were selected for the jury, were ever asked if they understood that a defendant is presumed innocent and accepted that proposition.

¶ 279    The trial court then dismissed 6 potential jurors from the first group and sent the remaining 6 jurors to the jury room and seated 14 more potential jurors in the jury box.

¶ 280    The trial court then asked those 14 if they understood that the defendant was presumed innocent and that it was the State's burden to prove the defendant guilty beyond a reasonable

doubt. No one disagreed. However, by this time six of the final jurors were already in the jury room and did not hear this question or have a chance to answer.

¶ 281    No one asked the second group of 14 if they understood that the defendant was not required to offer evidence on his own behalf, or if they accepted that proposition.

¶ 282    This means that only 6 and 2 alternates of the final 12 on the jury were asked if they knew that the defendant was presumed innocent and that the State had the burden of proving him guilty beyond a reasonable doubt, and that none of the final 12 and 2 alternates was ever told by anyone that the defense was not required to offer evidence on his behalf.

¶ 283    Immediately after the jury selection was complete the court went into trial mode and the State made its opening statement.

¶ 284    Following the trial, the trial court instructed the jury on the four *Zehr* principles. However, the *Zehr* court itself held: "If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of the trial will have little curative effect. *** [T]he subject matter of the questions should have been covered in the course of interrogation on *voir dire*." *Zehr*, 103 Ill. 2d at 477.


¶ 285                              Defendant's Own History of Discipline

¶ 286    The defense attorney did not ask the defendant or his mother what discipline was used on him by his mother, leaving the jury with no idea that the acts he took against Diamond were what he had grown up with. We need only look at today's headlines to see that child discipline and child abuse have been mixed up in the minds and lives of many families, and that in this defendant's family abusive discipline was in fact the norm.

¶ 287    The appellate attorney did not raise this failure by the defense attorney on appeal.

¶ 288    This issue has new life in recent headlines.

¶ 289    Famous football star, Vikings running back Adrian Peterson, has been charged with child abuse for "whooping" his four-year-old son with a tree branch. His defense is that he was "whooped" as a child by his father and that he is "being punished for behavior that is widely accepted in black culture." *Chicago Sun Times* columnist Mary Mitchell, in her column Tuesday, September 26, 2014 reported the incident, and his comments and added: "Yesterday we called it discipline. Today, they call it a crime. *** That's why whoopings are best left a cultural relic."

¶ 290    Indeed it is widely held that those who were beaten as children become beaters themselves. This does not make it right. But it does offer an explanation for what is otherwise inexplicable: that Richardson in "disciplining" his child fell back on the same discipline he himself suffered as a child, only without the filters of adult reflection and understanding or the knowing and acceptance that he must break away from the wrong lessons of his own past.

¶ 291    If Richardson was unable to understand the difference between willful disobedience by his one-year-old, and those behaviors that make one-year-old children so endearing and frustrating at the same time, then we must look first at his own mental condition and second at his own discipline history to understand what was missing from this 16-year-old's ability to cope.

¶ 292    If Richardson did not know that his child was not actively disobeying him, if, in fact, he really thought that telling a one-year-old to stop vomiting, to stand still, to not look at him would actually work, then we must believe we are dealing with a significantly immature person whose expectations and frustration would find answers only in his own very limited

past. Did his own mother ever lovingly correct his behavior? Did anyone ever explain to him that babies are not just little persons, and cannot be expected to behave like grown-ups or even small children? Did he have the mental capacity to understand that on his own?

¶ 293     Michael Eric Dyson, a professor of sociology at Georgetown University, said in his op-ed in *The New York Times*, September 18, 2014: "[S]tudies say our children endure [suffering] when they are beaten: feelings of sadness and worthlessness, difficulties sleeping, suicidal thoughts, bouts of anxiety, outbursts of aggression, diminished concentration, intense dislike of authority, frayed relations with peers, and negative high-risk behavior." Mr. Dyson of course denounces the practice as "child abuse dressed up as acceptable punishment" as do all modern sources and parents, but that still begs the question: what was Richardson taught? Do we really believe that he had the benefit of modern psychology or sociology to inform his immature reaction to his child's behavior? Or was his own behavior modeled after the only constant adult in his life, his mother who beat him with cords, belts, sticks?

¶ 294     Child Trends, a research group, in studying families of all races reported that: "[u]se of corporal punishment is linked to negative outcomes for children (e.g., delinquency, antisocial behavior, psychological problems, and alcohol and drug abuse), and may be indicative of ineffective parenting. Research also finds that the number of problem behaviors observed in adolescence is related to the amount of spanking a child receives. The greater the age of the child, the stronger the relationship." Child Trends, *Attitudes Toward Spanking* (2013), http://www.childtrends.org/?indicators=attitudes-toward-spanking.

¶ 295               Did Richardson Intend to Murder the Child? Medical Examiner Testimony

¶ 296     The due process clause of the Fourteenth Amendment requires that a person may not be convicted in state court "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). See also U.S. Const., amend. XIV; *People v. Cunningham*, 212 Ill. 2d 274 (2004).

¶ 297     In Richardson's case the State presented evidence, and Richardson admitted, that he intended to inflict the injuries to Diamond, but Richardson contended he did not intend to murder her. The State's only evidence of his intent was the medical examiner's testimony that the injuries were intentionally inflicted, that is, they could not have occurred by accident. But Richardson did not deny that. By framing the injuries as intentional the State used that same intent as an element of murder, that is, to intend to murder the child. Richardson denied that. His mental capacity, his childhood, his age and experience were never offered by defense counsel to challenge the State's proof beyond a reasonable doubt of his intent to murder.

¶ 298     Appellate counsel did not raise this issue.

¶ 299     Neither the defense attorney nor the appellate attorney raised as an issue the testimony of the medical examiner which may have been misleading to the jury about the intent of the defendant. The medical examiner testified that the injuries to the child were inflicted intentionally, the defense objected and the court overruled the objection. Then, the medical examiner testified again that the injuries to the child were inflicted intentionally, the defense objected and the objection was sustained, however, the damage was already done–the medical examiner used the specific word "intentionally" twice in but a few minutes, reinforcing the perception that the defendant had intentionally murdered his child. The defendant never denied he intentionally inflicted the injuries to his child, but he did deny that he intended to murder her. Those two concepts were irretrievably meshed by the medical examiner's use of the word

"intentionally."

¶ 300                    No Argument by Defense for Motion for Directed Finding

¶ 301    The defense attorney did not even bother to argue on her motion for a directed finding at the close of the State's case, and the appellate attorney did not raise this as an issue of ineffective assistance. Of course, since the defense attorney did not produce any evidence in the motion to suppress hearing, the court had no evidence on which to even consider whether the State had made its case: she demonstrated her own ineffectiveness when she was unable to find any reason to give for a directed verdict, when at the very least if she had presented the evidence of his mental ability and history of family life, she could have argued the State had not proved intent beyond a reasonable doubt.

¶ 302                    No Evidence Provided to Support Finding of Reckless Behavior

¶ 303    The defense attorney did not ask Richardson any questions about his own childhood, his mother's discipline methods, or the situation in his family where he was really on his own, living with his mother's boyfriend's sister so he could watch her three children, as a free baby sitter, when he should have been able to look to his own mother for care.

¶ 304    The appellate counsel did not raise this as an issue of ineffective assistance.

¶ 305    The defense attorney put on no evidence of his character, personality, mental ability, or upbringing to put his actions into some perspective, so when the court said "there is no evidence *** of recklessness" the court was technically correct. And that statement by the court is evidence itself that defense counsel was ineffective.

¶ 306    The appellate counsel did not raise this as a matter of ineffective assistance.

¶ 307                    No Argument by Defense for Its Motion for a New Trial

¶ 308    The defense attorney made no argument in her motion for a new trial. Clearly, she demonstrated her own ineffective assistance by failing to provide any evidence for the court to consider, much less grant, a motion for a new trial.

¶ 309    Appellate counsel did not raise that as an issue of ineffective assistance.

¶ 310                                        Sentencing

¶ 311    The defense attorney did not challenge the court's remark that there was no evidence in mitigation in the psychological evaluation, when in fact there was plenty of evidence of his mild mental retardation, his illiteracy at the time of his arrest, and his low functioning IQ of 61, described in the Behavioral Clinical Exam (BCX) and his family and social history, all of which the court had an obligation to consider when sentencing a juvenile at the time of the offense. The court is under an obligation to consider the potential for rehabilitation. The presentence report plainly stated that the defendant had made significant gains in his reading *while incarcerated*, and that with further educational opportunities he could be expected to improve even more. The court simply did not take any of this into consideration.

¶ 312    The appellate counsel did not raise this as a matter of ineffective assistance of counsel, or as a challenge to the sentence of 40 years.

¶ 313    The "seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence." *People v. Cox*, 377 Ill. App. 3d 690 709 (2007). However,

from 2005 to 2012 the United States Supreme Court spoke with compelling clarity about new scientific research that demonstrates that juvenile offenders are not just small adults and should be treated with the understanding that they have an undeveloped sense of responsibility, are more easily influenced by outside pressure, and are not fully formed, meaning his or her personality traits are still susceptible to change. *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005). "The susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' " *Roper*, 543 U.S. at 570 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)). "[T]he Supreme Court has acknowledged that offense severity does not automatically turn a child into an adult and that immaturity is relevant in assessing culpability." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 57 (citing *Miller*, 567 U.S. ___, 132 S. Ct. 2455, *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394 (2011), *Graham*, 560 U.S. 48, and *Roper*, 543 U.S. 551). The other factors to be considered by the court in sentencing are "the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992).

¶ 314    Our courts have consistently held that "[i]f *mitigating evidence* is presented to the trial court, we are to presume, absent some indication to the contrary, other than the sentence itself, that the trial court considered it." (Emphasis added.) *Willis*, 2013 IL App (1st) 110233, ¶ 123 (citing *People v. Benford*, 349 Ill. App. 3d 721, 735 (2004)).

¶ 315    The problem with Richardson's case is that because defense counsel did not present any mitigating evidence of Richardson's mental ability or family/social history, only the PSI and the BCX were available to the judge in mitigation. While these two reports are compelling, the missing evidence of his mental ability and family/social history before the trial, at the motion to suppress, and during the trial itself would have provided a context for the actions of Richardson, which was important for consideration in jury deliberations and in sentencing. The jury never saw those reports. The court clearly read the reports before sentencing. However, defense counsel's failure to provide the court and the jury with Richardson's immaturity and his own history left him unable to persuade the jury in its verdict or the judge in sentencing him to 40 years.

¶ 316                                  Richardson Did Not Know

¶ 317    There are lots of things that Richardson did not know when he was 16. He did not know that you cannot feed a one-year-old an adult-size bowl of cereal. He did not know that pushing on her stomach would inevitably lead to her vomiting. He did not know that one-year-olds cannot be expected to stop vomiting because someone says to–in fact, no adult could do that either. He did not know that it is impossible to expect a one-year-old to stand still for a few seconds let alone several minutes. He did not know that leaving a one-year-old in a bathtub even for a minute is an invitation to disaster. He did not know that a karate chop to the child's ribs could cause internal injuries that could kill her. He did not know that hitting a small child in any way could cause such severe internal injuries that she could die. He did not know that shaking to wake her up could kill her. Or that a neighbor shaking the same child could kill her. The court and the system expected the mentally retarded 16-year-old with a functioning IQ of 61 to know a cumulation of things that many adults only vaguely realize, and avoid behavior that many parents, even today, engage in as forms of discipline.

## Conclusion

Even Richardson knows he must be held accountable for the terrible things he did to Diamond. No one could hear the facts in this case and not be moved to seek justice for that child. But we must also seek justice for another child, the boy child who was her father but was unable to be her parent. Justice for this defendant would be to remand his *pro se* postconviction petition so that it can move to the second stage with an attorney who can amend the petition and properly prepare his case.